## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CARZANNA JONES
111 Pepper Mill Drive
Capitol Heights, MD  20743

HEYNARD L. PAZ-CHOW
527 NE 210th Terrace
Miami, FL 33179,
on behalf of themselves and all others
similarly situated,

        Plaintiffs,

   v.

JOHN MICHAEL MULVANEY, in his
official capacity as Acting Director,
Consumer Financial Protection Bureau,
1700 G Street NW
Washington, DC 20552

CONSUMER FINANCIAL PROTECTION
BUREAU,
1700 G Street NW
Washington, DC 20552

        Defendants.

Case No.: 18-cv-2132-BAH

Chief Judge Beryl A. Howell

Jury Trial Requested

## AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT

Plaintiffs Carzanna Jones and Heynard L. Paz-Chow ("Plaintiffs"), on behalf of

themselves and all others similarly situated, hereby file this Class Action Complaint of

discrimination and retaliation against Defendants Consumer Financial Protection Bureau and

John Michael Mulvaney, Acting Director of the CFPB (collectively "Defendants," "CFPB," or

the "Bureau"), and in support state as follows:

## OVERVIEW

1.     The CFPB is tasked with fighting for justice on behalf of American consumers,

but its own employees have found their work environment less than just.  The CFPB maintains a

1

biased culture replete with harmful stereotypes regarding its racial minority and female employees that infect its policies and decision-making, including performance evaluations, compensation, and promotions. Plaintiffs, and the class they seek to represent in this lawsuit challenge the CFPB's Bureau-wide policies and practices that result in lower pay and performance appraisals, and fewer promotions for racial minorities and women.

2.      Plaintiffs file this lawsuit to hold the CFPB accountable for its unlawful treatment of racial minorities and women and to achieve meaningful reform. This lawsuit is brought by Plaintiffs on behalf of themselves and all other minority employees and women who work or worked as Consumer Response Specialists, and have been subjected to and harmed by the Bureau's agency-wide pattern or practice of discrimination and retaliation and discriminatory policies and practices. This action seeks class-wide injunctive relief to end CFPB's entrenched racial and gender discrimination and retaliation and make-whole relief for class members.

## JURISDICTION AND VENUE

3.      Plaintiffs' claims arise under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*("Title VII"), the Equal Pay Act, 29 U.S.C. § 206(d), and the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 701, *et seq*. and this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, and 1343.

4.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).  The CFPB is headquartered in this District. Throughout their tenure at the CFPB, Plaintiffs worked for and were harmed by CFPB in this District. The unlawful conduct alleged in this Complaint occurred in this District and across the United States.

434479

## PARTIES

5.      Defendant John Michael Mulvaney is the Acting Director of the CFPB. He is sued in his official capacity.

6.      Defendant CFPB is an executive agency of the United States within the meaning of 5 U.S.C. § 105.  Established in Title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act, the Bureau regulates consumer financial products and services in compliance with federal law.

7.      Plaintiff Heynard Paz-Chow ("Paz-Chow") is a man of Asian and Hispanic descent who worked for three years in CFPB's Consumer Response Division. Throughout his employment, Paz-Chow competently discharged all duties assigned to him and enjoyed an excellent reputation regarding the high quality of his work and his conscientious devotion to his job. Nevertheless, consistent with Defendants' pattern or practice of discrimination and Bureau-wide discriminatory policies, the CFPB subjected Paz-Chow to discrimination and retaliation.

8.      Plaintiff Carzanna Jones ("Jones") is an African American woman who has been employed by the CFPB in the Consumer Response Division for over six years.  Jones too has competently discharged all duties assigned to her and enjoyed an excellent reputation with regard to the high quality of her work and her conscientious devotion to her job.  Like Paz-Chow, and also consistent with CFPB's pattern or practice of discrimination and Bureau-wide discriminatory policies, the CFPB subjected Jones to discrimination and retaliation.

## FACTUAL ALLEGATIONS

**I.    The CFPB Has and is Engaged in Bureau-Wide Systemic Discrimination Against Minority Employees and Female**

9.      The Bureau has and is engaged in a pattern and practice of race and gender discrimination against minority and women employees and maintains policies and practices that

3

434479

have a disparate impact on racial minorities and females.  CFPB maintains stereotypical views about the skills, abilities, and potential of its racial minority and female employees that form the basis of its policies and practices and result in the segregation and differential treatment of minorities and women.

10.     During Plaintiffs' employment, CFPB has engaged in a pattern and practice of unlawful conduct toward its minority and women employees, including but not limited to the following:

a)      excluding minorities and women from training opportunities that are regularly offered to white or male employees;

b)      excluding minorities and women from details, projects and other assignments that are regularly offered to white or male employees;

c)      employing bureau-wide performance evaluation policies that disproportionately result in high-performance ratings for white or male employees and average (or lower) performance ratings for minority and women employees;

d)      employing a quota system to measure employee productivity that weighs investigation assignments without regard to complexity while assigning minorities and women the majority of longer-term, more complex investigations;

e)      failing to credit minorities and women  for their experience on the same basis as white or male employees and failing to consider minorities and women for timely promotions and title changes on the same basis as whites or men;

f)      failing to grant minority and women employees conversions from "straight term" or from "term to perm" to permanent status on the same basis as white or male employees;

g)      systematically paying minorities and women lower wages and/or denying minorities and women opportunities to increase their earnings;

h)      retaliating against minority and women employees who complain of discrimination including by subjecting them to further discrimination, harassment, retaliation, and constructively discharging or discharging them.

**A.   A Congressional Investigation and Independent Studies Find Discrimination and Retaliation at the Bureau**

434479

11.     The Bureau's performance management policies and practices have already been found to have a disparate impact on minorities and women.  The U.S. House of Representatives Committee on Financial Services held hearings on April 2 and May 21, 2014, to investigate "Allegations of Discrimination and Retaliation within the Consumer Financial Protection Bureau."  The transcripts and exhibits of those hearings demonstrate a widespread culture of discrimination and retaliation at the Agency.

12.     On April 2, 2014, Bureau's Consumer Response attorney, Angela Martin, testified to the "culture of retaliation and intimidation that silences employees from exposing wrongdoing."  She also testified that "the white males in power" at Consumer Response give themselves the highest performance evaluation ratings, ensuring for themselves the top raises and bonuses.  Meanwhile, minority employees make up what is called "the plantation."  They do the work of the Bureau but receive lower performance ratings and fall farther behind in compensation, creating a racial pay gap that continues to widen.

13.     The Bureau's internal analysis confirmed that Caucasian Bureau employees were significantly more likely than minorities to receive the highest performance rating and significantly less likely to receive the lower ratings.  For example, a white employee was twice as likely as an African American or Hispanic to receive the top rating in 2013.

14.     Independent investigator Misty Raucci testified to her finding that "the general environment in Consumer Response is one of exclusion, retaliation, discrimination, demoralization, and other offensive working conditions which constitute a toxic workplace for many of its employees."  Indeed, while investigating Martin's case, Raucci was inundated by calls from other employees, and she "became a veritable hotline for employees of the Agency who called [her] to discuss their own maltreatment at the Bureau."

434479

15.     At the May 21, 2014, Congressional hearing, it becomes "apparent that the Agency was aware of the racial disparities in key metrics" since at least September 2013, when the Bureau received the study it had commissioned from Deloitte Consulting.  The Deloitte study found "sharp racial disparities in performance ratings, pay, hiring, and other areas."  It also found "that the minority population is overrepresented in the lower pay bands and underrepresented in the higher pay bands, which is masked in the Bureau-level data."  Nine months after receiving the Deloitte study, the Bureau finally conceded that its performance rating practices had caused "widespread disparities" that were "statistically significant . . . in many categories . . ., including race/ethnicity [and] age[.]"

## B.  The OIG Report Confirms Systemic Discrimination in Pay and Performance Ratings

16.     On March 4, 2015, the Office of Inspector General ("OIG") issued a report entitled "The Agency Can Enhance Its Diversity and Inclusion Efforts."  The impetus for the OIG report was a March 24, 2014, letter from Congress requesting an investigation "to detect whether any personnel practices and policies have created an unfair or discriminatory workplace for minorities and women employed at the CFPB."  The letter noted:

> We are concerned about recent allegations that managers at the [Agency] have shown *a pattern of ranking white employees distinctly better than minority employees in performance reviews*, as reported in a recent American Banker article entitled, "Agency Staff Evaluations Show Sharp Racial Disparities," on March 6, 2014.

17.     In response, the OIG commissioned DCI Consulting Group to perform a statistical analysis of the Bureau's 2012 and 2013 performance ratings.  As the consultants explained, the Bureau's performance rating system was key to understanding pay disparities because it:

> serves as the basis for determining "pay-for-performance" amounts provided to employees.  These increases take two forms: *merit increases*, which affect employees' base salary and growth over time, and *supplemental lump-sum*

6

*payments*.  Both of these annual compensation programs are in part dependent upon an employee's performance rating.

18.    The consultants found that:

Whites were rated significantly higher than African Americans in 2012 and 2013. . . . Additionally, Whites were rated significantly higher than Hispanics in 2013[.]

The OIG determined that these racial disparities became more widespread within the Bureau in 2013 than they had been the year before.

19.    The OIG also found that white employees make up a greater percentage of higher paid employees.  For each of the three years studied, "[w]hite employees as a percentage of total employees within each pay grade series increased as the pay increased."  In 2013, for example, although white employees made up only 52 percent of the lower paid workforce, they made up almost 76 percent of the higher paid workforce.

20.    These findings were consistent with the Bureau's own internal analysis, which found statistically significant disparities in performance ratings based on race and ethnicity, among other protected factors.  Notably, in four of the six divisions within the Bureau, "[w]hite employees received higher performance ratings, on average, than Black/African American employees," and this same disparity for Hispanics existed in three of the six divisions.  These disparities were not the result of happenstance.  Even after receiving the OIG Report, the Bureau did not require its managers and supervisors to attend diversity and inclusion training.

C.    **The Bureau's Own Data Demonstrate the Discriminatory and Retaliatory Environment**

21.    The Bureau's data show that Caucasian employees were paid, on average, significantly more than African Americans in every year between 2011 and 2016, as shown below:

| Year | Average End of Year Salary |
|------|----------------------------|

7

|  | Caucasian | African American |
|---|---|---|
| 2011 | $111,489 | $83,421 |
| 2012 | 99,825 | 83,125 |
| 2013 | 101,891 | 86,567 |
| 2014 | 103,578 | 88,129 |
| 2015 | 105,576 | 90,265 |
| 2016 | 109,886 | 94,207 |

22.     In addition, male employees were paid, on average, significantly more than

women in 2011, 2012, 2013, and 2015, as shown below:

| Year | Average End of Year Salary | |
|---|---|---|
|  | Male | Female |
| 2011 | $106,521 | $101,872 |
| 2012 | 99,933 | 91,446 |
| 2013 | 98,615 | 96,025 |
| 2015 | 103,657 | 99,712 |

23.     Moreover, Bureau data demonstrate that those who complained about

discrimination were, on average, significantly less likely to be promoted:

| Year | Percentage of Employees Promoted | |
|---|---|---|
|  | No EEO Activity | Complained of Discrimination |
| 2013 | 8% | 6% |
| 2014 | 9% | 6% |
| 2015 | 8% | 5% |
| 2016 | 10% | 3% |

24.     The discrimination described above is ongoing and constitutes a continuing

violation of federal civil rights laws.  The discriminatory policies and practices at CFPB are

uniform and national in scope.  Class members relying on Plaintiffs to protect their rights work

or worked for CFPB throughout the country and were harmed by these same policies and

practices.

II.     **The CFPB Has Subjected Jones To Unlawful Treatment And Retaliation**

434479

25.     Jones came to the CFPB with considerable relevant experience after serving as a paralegal for the United States Army and Department of Defense ("DOD").  At the DOD, Jones excelled in a range of duties including investigating consumer complaints related to credit cards, loans, mortgages, and other financial disputes.  Jones contacted financial institutions including credit reporting agencies and debt collection companies regarding consumer complaints.  She reviewed case files to determine if the institution had committed any violations, attempted to resolve those issues, and counseled consumers about their options.

26.     In 2012, Jones interviewed for and was offered a position with CFPB.  Jones began working as a CFPB Consumer Response Specialist on September 30, 2012.

27.     As a part of the mortgage team at the CFPB, Jones's duties included reviewing consumers' mortgage complaints, investigating those complaints, and deciding which, if any, regulations had been violated.  Jones also helped to track various financial institutions to detect any patterns of violations or other trends.

28.     Throughout her employment, Jones has been denied the training and mentoring opportunities that were provided to her white male colleagues.

29.     In spite of her dedication and demonstrated success at CFPB, the Bureau has treated Jones less favorably than her white, male counterparts and retaliated against her for complaining about her discriminatory treatment.

30.     For example, Jones has been consistently paid less than similarly situated white and male colleagues at the Bureau, including male Consumer Response Specialists in her facility Alem Veladar, Kurt Lessor, and Matthew O'Reilly.  Although Jones, Veledar, Lessor, and O'Reilly held the same position—which required each to investigate companies for any violations of regulations and statutes the CFPB enforced—the male Consumer Response

9

434479

Specialists are and were compensated at higher pay grades. In addition, Jones's performance evaluations did not accurately reflect her performance, because the Bureau failed to assign investigations equally: Jones was assigned complex investigations that took longer to close, while less complex investigations that required little time to complete were given to whites and male employees.

31.    The Bureau also improperly denied Jones promotions and transfers to other positions. For example, although she met the requirements for a "Career Ladder" promotion, the Bureau refused to promote Jones.

32.    By selectively providing special projects and detail assignments to non-African Americans and males, the CFPB steered more desirable assignments and promotions to whites and males. For example, the CFPB gave a position to Christopher Dean (a white male), who was hired three months after Jones, because the Bureau hand-picked him for a special project related to the position. Jones, in contrast, was never offered a project or detail assignment during her entire tenure at the CFPB.

33.    Similarly, Jones was frequently passed over for training opportunities. For example, CFPB offered leadership training but never chose Jones. Instead, the vast majority of employees that were able to attend training were white males.

34.    The CFPB also violated Jones's rights under the Americans with Disabilities Act when they failed to engage in the interactive process, held her disability against her and used the reasonable accommodation process as a further opportunity to discriminate and retaliate against her.

35.    For example, Jones took FMLA leave due to her disability of suffering crippling migraines, anxiety, and depression, but the Bureau considered her AWOL. Both of her managers

434479

knew about Jones's disability, yet they took her absence as an excuse to deny her the opportunity to move to a different product.

36.    While Jones was incapacitated with her disability, CFPB had a restructuring where they allowed employees to move onto other projects.  Yet, when Jones returned to work she was not offered the same opportunity to move to another project—though her desire to do so was well known to CFPB management.

37.    Jones's disability affected her production numbers, and despite explaining this to her managers and requesting an accommodation for her disability, Jones's supervisors and CFPB used her disability as one more opportunity to discriminate and retaliate against her.

38.    She submitted the required reasonable accommodation paperwork but heard nothing for many weeks.  When Jones asked about the status of her request, HR told her they lost the paperwork and she would have to resubmit everything.  Jones resubmitted the written accommodation materials.

39.    After she reviewed an email from the CFPB Director explaining the Bureau was evaluating "a systemic disadvantage to various categories of employees," Jones filed a complaint of discrimination and retaliation with the CFPB's Equal Opportunity Office ("EEO") on or about August 19, 2014.  CFPB retaliated by denying Jones's request for reasonable accommodation the next day.

40.    As a result of CFPB's conduct described above, Jones has suffered substantial damages.  Jones has lost wages and other benefits, suffered embarrassment and humiliation, and her career has been irreparably damaged.

### III.    The CFPB Has Subjected Paz-Chow To Unlawful Treatment And Retaliation

434479

41.     Paz-Chow joined the Bureau in September 2011.  He brought with him considerable expertise and experience.  He earned degrees in political science and finance from Florida International University, and also holds an M.B.A. from Regis University.  Before joining the Agency, Paz-Chow was honorably discharged from the United States Army, he worked for the Federal Deposit Insurance Corporation ("FDIC") for two years, and he worked as a Senior Commercial Lender for several major banks for eleven years.  At the FDIC, Paz-Chow gained extensive experience concerning the regulatory compliance requirements for financial institutions and personally oversaw the closing of 20 to 30 banks.

42.     Paz-Chow was responsible for reviewing the regulatory compliance of large financial institutions in response to complaints filed against those institutions.  He also served as the point person on bank regulatory compliance, Freedom of Information Act ("FOIA") responses, and mortgage investigations.  The Bureau also relied on Paz-Chow as an unofficial mentor and supervisor of new employees, whom he trained in investigative structures, writing, and responding to Congressional inquiries.

43.     Despite his dedication and accomplishments, the Bureau discriminated against Paz-Chow by treating him less favorably than his white colleagues and retaliated against him for engaging in protected activity.  For example, the CFPB's Bureau-wide performance evaluation policy has resulted in Paz-Chow receiving lower performance reviews than those given to his white counterparts whose performance was the same or worse than his.

44.     The CFPB's performance evaluations included many subjective elements that resulted in lower rankings without any objective support, comments, or documentation.  Evaluations were also based on the number of investigations Paz-Chow and others completed, but the CFPB gave no consideration to the different level of complexity or the length of time it

434479

took to complete investigations. While Paz-Chow's investigations often included some of the most complicated and time-consuming assignments at the Bureau, his white colleagues often received simple investigations requiring little time to complete.

45.    These discriminatory performance evaluations led to unequal pay as well as discrimination in promotions at the CFPB. For example, Paz-Chow applied for two separate promotions to Team Lead positions—positions he was particularly qualified for given his extensive experience and role as an informal trainer of new employees. Not only did the CFPB not select him for either promotion, it also did not bother to inform him of that fact. In contrast, white employees have applied for and received promotions to positions that were never even posted.

46.    Following the advice of his supervisors, Paz-Chow sought additional training and detail assignments to increase his chances of obtaining a promotion and pay raise. Here too, however, Paz-Chow's path was stymied by discrimination. For example, the Bureau offered supervisory leadership training exclusively to an unpublished list of mostly white employees based on a subjective assessment of their "leadership potential," but denied Paz-Chow's requests.

47.    Once he realized the full extent of the discrimination within the Bureau, Paz-Chow openly challenged those policies and the discriminatory methods for determining who received promotions and training and unequal pay. The CFPB retaliated against Paz-Chow and other minority employees who spoke out about discrimination and participated in the EEO process.

48.    For example, after he began the EEO complaint process, the CFPB informed Paz-Chow that it would not be extending his contract and refused to convert him from a "term" to "perm" employee. The CFPB claimed a diminished caseload and fewer investigations justified

434479

this action.  A CFPB manager informed Paz-Chow, however, that if he withdrew his EEO complaint he would be offered a permanent position with the CFPB.  In addition, the Bureau continued to grant term extensions, to convert employees to permanent status, and to promote white employees with less seniority and experience than Paz-Chow, but who did not complain about discrimination.  The Bureau even promoted at least one employee that Paz-Chow trained, and the Bureau's caseload continued to grow.

49.    Paz-Chow applied for more than a dozen other positions; for most of them, the Bureau did not interview him or respond to his application in any way.  Notably, when Paz-Chow applied for a permanent Consumer Response Specialist position, the Bureau deemed him "not qualified" despite the fact that he held that position on a term basis and was extremely qualified and competent in that position.

50.    As a result of CFPB's conduct described above, Paz-Chow has suffered substantial damages.  Paz-Chow has lost wages and other benefits, suffered embarrassment and humiliation, and his career has been irreparably damaged.

## CLASS AND COLLECTIVE ACTION ALLEGATIONS

51.    Pursuant to 29 U.S.C. § 216(b), Plaintiff Jones seeks collective action treatment for her claims under the Equal Pay Act on behalf of female Consumer Response Specialists.

52.    Plaintiff Jones is similarly situated to female Consumer Response Specialists who were paid less than their male counterparts for substantially equal core tasks and responsibilities.

53.    Plaintiffs bring this Title VII action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of racial minorities and females who worked for the CFPB as Consumer Response Specialists and who were subjected to discrimination and retaliation by

434479

CFPB due to their race or gender. All requirements of class certification are met by the proposed class.

54.     The class of racial minority or female employees and former employees is so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1).

55.     There are questions of law and fact common to the class, and those questions can and should be resolved in a single proceeding that furthers this litigation. Fed. R. Civ. P. 23(a)(2).

56.     The claims alleged by Plaintiffs are typical of the claims of the class members. Fed. R. Civ. P. 23(a)(3).

57.     Plaintiffs will fairly and adequately represent and protect the interests of the class. Fed. R. Civ. P. 23(a)(4).

58.     The proposed class also meets the requirements for certification under Rule 23(b)(2) and/or Rule 23(b)(3). The questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3).

59.     The issues of determining liability and equitable relief, among other issues, are also appropriate for certification under Rule 23(c)(4), as are other common issues.

## <u>COUNT I</u>

### RACE AND GENDER DISCRIMINATION IN VIOLATION OF
### 42 U.S.C. § 2000e *et seq.*

60.     Plaintiffs, individually and on behalf of those similarly situated, reallege paragraphs 1 through 59 above and incorporate them by reference as though fully stated herein as part of Count I of this Complaint.

434479

61.    Plaintiffs filed Class Complaints with the CFPB's Equal Employment Opportunity ("EEO") Office and have exhausted their administrative remedies.

62.    Title VII of the Civil Rights Act of 1964, as amended, makes it unlawful for an employer to discriminate against any individual in the terms, conditions, or privileges of employment on the basis of race and/or gender, or to limit, segregate, or classify its employees or applicants for employment in any way which deprives or tends to deprive any individual of employment opportunities or otherwise adversely affects his or her status as an employee on the basis of race.

63.    By their conduct as alleged herein, Defendants unlawfully discriminated against Plaintiffs and those similarly situated in violation of Title VII, under both disparate treatment and disparate impact theories of liability.

64.    On behalf of themselves and the class they seek to represent, Plaintiffs request the relief set forth below.

## COUNT II

### RETALIATION IN VIOLATION OF
### 42 U.S.C. § 2000e *et seq.*

65.    Plaintiffs, individually and on behalf of those similarly situated, reallege paragraphs 1 through 59 above and incorporate them by reference as though fully stated herein as part of Count II of this Complaint.

66.    Plaintiffs filed class complaints with the CFPB's Equal Employment Opportunity ("EEO") Office and have exhausted their administrative remedies.

67.    Title VII of the Civil Rights Act of 1964, as amended, makes it unlawful for an employer to retaliate against an employee based on the employee's complaint of discrimination or opposition to employment discrimination.

434479

68.      Plaintiffs engaged in protected activity by complaining of their unlawful treatment and opposing CFPB's discriminatory practices.

69.      Plaintiffs suffered retaliation and harm because of their protected activity, in violation of 42 U.S.C. § 2000e-3(a).

70.      On behalf of themselves and the class they seek to represent, Plaintiffs request the relief set forth below.

## COUNT III

### VIOLATION OF THE EQUAL PAY ACT
### 29 U.S.C. § 206(d)

71.      Plaintiff Jones, individually and on behalf of those similarly situated, realleges paragraphs 1 through 40 above and incorporates them by reference as though fully stated herein as part of Count III of this Complaint.

72.      The CFPB is an "employer" as defined by the Equal Pay Act, 29 U.S.C. §§ 203(d), 206.

73.      The Bureau has willfully discriminated against Jones and similarly situated female workers in violation of the Fair Labor Standards Act of 1938, 29 U.S.C. § 206(d), as amended by the Equal Pay Act of 1963, by subjecting them to unequal pay on the basis of sex.

74.      The CFPB discriminated against Plaintiff and similarly situated female workers by paying them lower wages and treating them differently from and less preferably than male employees who performed jobs which required substantially the same skill, effort, and responsibility, and which were performed under similar working conditions.

75.      The CFPB knew or should have known that paying male and female employees working in the same position and performing substantially equal duties would violate the Equal Pay Act.

434479

76.    The Bureau caused, attempted to cause, contributed to, or caused the continuation of the wage rate discrimination based on sex in violation of the Equal Pay Act.  Further, Defendant knew or showed a reckless disregard for the fact that its conduct violated the Equal Pay Act.

77.    As a result of the CFPB's conduct alleged herein, including the Bureau's willful, knowing, and intentional discrimination, Jones and similarly situated female workers suffered and continue to suffer harm, including lost wages, lost benefits, and other financial loss.

78.    On behalf of herself and the class she seeks to represent, Plaintiff Jones requests the relief set forth below.

## COUNT IV

### VIOLATION OF THE REHABILITATION ACT OF 1973
### 29 U.S.C. §§ 701, *et seq.*

79.    Plaintiff Jones realleges paragraphs 1 through 40 above and incorporates them by reference as though fully stated herein as part of Count IV of this Complaint.

80.    Jones, individually, brings this Count under the Rehabilitation Act of 1973, 42 U.S.C. §§ 701, *et seq*., as amended ("Rehabilitation Act").

81.    At all relevant times, the Bureau was a covered "employer" within the meaning of the Rehabilitation Act and required to comply with its provisions.

82.    At all relevant times, Jones was a covered "employee" within the meaning of the Rehabilitation Act and entitled to its protections.

83.    At all relevant times, Jones was a qualified individual with a disability within the meaning of the Rehabilitation Act.

434479

84.     At all relevant times, Jones had a disability that was covered by the Rehabilitation Act, that impacted one or more of her major life functions; and the Bureau regarded her as having such an impairment.

85.     At all relevant times, Jones could perform the essential functions of her positions with the Bureau with or without reasonable accommodation.

86.     Jones informed the Bureau about her disability and requested a reasonable accommodation, but the Bureau failed to engage in the interactive process.

87.     The Bureau discriminated and retaliated against Jones by not properly processing her request for a reasonable accommodation, and denying her promotions, transfers, training and other opportunities.

88.     Plaintiff Jones requests the relief set forth below.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court find in favor of them and the class they seek to represent and against Defendants as follows:

a.  Certify this case for collective and class action treatment, authorize notice, and equitably toll FLSA limitations periods;

b.  Designate Plaintiffs as Class Representatives and designate Plaintiffs' counsel of record as Class Counsel;

c.  Declare that the CFPB's acts, conduct, policies, and practices are unlawful and violate the federal statutes identified in the Counts alleged against them above;

434479

d.  Declare that CFPB engages in a pattern and practice of racial discrimination against racial minorities and women, and employs policies and practices that have an unlawful disparate impact on racial minorities and women;

e.  Order that the CFPB stop discriminating and retaliating against racial minorities and women, and cease implementing policies and practices that have a disparate impact on racial minorities and women.

f.  Order Plaintiffs and all others similarly situated reinstated to their appropriate positions, promotions, and seniority, and otherwise, make Plaintiffs whole;

g.  Award Plaintiffs and all others similarly situated the value of all compensation and benefits lost and that they will lose in the future as a result of CFPB's unlawful conduct;

h.  Award Plaintiffs and all others similarly situated compensatory and punitive damages and liquidated damages;

i.  Award Plaintiffs and all others similarly situated prejudgment interest, attorneys' fees, and costs, as provided by law; and

j.  Award Plaintiffs and all others similarly situated such other make whole equitable, injunctive, and legal relief as this Court deems just and proper to end the discrimination and fairly compensate Plaintiffs and those similarly situated.

## **DEMAND FOR A JURY TRIAL**

Plaintiffs hereby demand a jury trial as provided for by Rule 38(a) of the Federal Rules of Civil Procedure.

Respectfully submitted on behalf of Plaintiffs and those similarly situated,

434479

_s/ George S. Robot_

Date: December 4, 2018

George S. Robot (Dist. D.C. Bar No. IL0047)
STOWELL & FRIEDMAN, LTD.
303 W. Madison Street, Suite 2600
Chicago, Illinois 60606
Phone: 312-431-0888
Facsimile: 312-431-0228
Email: GRobot@sfltd.com

434479