**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CARZANNA JONES and HEYNARD L. PAZ-CHOW, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br>  v.<br><br>KATHLEEN KRANINGER, in her official capacity as Director, Consumer Financial Protection Bureau, and CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>    Defendants. | Civil Action No.: 18-2132 (BAH)<br><br>**Chief Judge Beryl A. Howell** |

## <u>DEFENDANTS' MOTION FOR PROTECTIVE ORDER</u>

Pursuant to Federal Rule of Civil Procedure 26(c) and this Court's Minute Order of July 14, 2020, Defendants Kathleen Kraninger, acting in her official capacity, and the Consumer Financial Protection Bureau (collectively, the "Bureau") respectfully move this Court for a protective order limiting the requests for production of documents served by Plaintiffs under Federal Rule of Civil Procedure 34.  As discussed below, not only are Plaintiffs' requests unduly burdensome and not proportional to the needs of the case, but Plaintiffs have had "ample opportunity to obtain the information [they seek] by discovery in [this] action."  Fed R. Civ. P. 26(b)(2)(C)(ii).  Further, because Plaintiffs were not diligent, there is no "good cause" to modify the existing case schedule in order to permit Plaintiffs to obtain discovery that they chose not to pursue until after the Court's May 27, 2020 hearing, and that exceeds an amount which the Bureau could reasonably complete in the time remaining.  Accordingly, the Bureau asks that the Court "limit . . . the extent of discovery" as described in the Bureau's accompanying

Memorandum of Points and Authorities in Support of Motion for Protective Order and its

Proposed Order.  Fed R. Civ. P. 26(b)(2)(C).

The parties conferred regarding this dispute on multiple occasions, including on July 7

and 8, 2020.  Plaintiffs' counsel have indicated they oppose the Bureau's position, as reflected in

the parties' joint statement submitted to the Court's chambers on July 10, 2020.

Respectfully submitted,

/s/ Derick Sohn

Mary McLeod
    *General Counsel*
John R. Coleman
    *Deputy General Counsel*
Laura Hussain
    *Assistant General Counsel*
Thomas McCray-Worrall
    *Senior Counsel*
Allison Ziegler
    *Senior Counsel*
Derick Sohn
    *Senior Counsel*
Azmi F. Kazzi
    *Senior Counsel*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, D.C. 20552
(202) 435-7873 (telephone)
(202) 435-7024 (facsimile)
derick.sohn@cfpb.gov
*Counsel for Defendant*
*Consumer Financial Protection Bureau*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CARZANNA JONES and HEYNARD L. PAZ-CHOW, on behalf of themselves and all others similarly situated,<br><br>             Plaintiffs,<br>   v.<br><br>KATHLEEN KRANINGER, in her official capacity as Director, Consumer Financial Protection Bureau, and CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>             Defendants. | Civil Action No.: 18-2132 (BAH)<br><br>**Chief Judge Beryl A. Howell** |

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF MOTION FOR PROTECTIVE ORDER**

**INTRODUCTION**

The Bureau took seriously the Court's admonishment at its last hearing that it wanted both sides to be "working very hard" on this case. Dkt. 30, 3:15-17. Indeed, the Bureau believes the record demonstrates that it has been working very hard on discovery *throughout* this litigation. Unfortunately, this record shows Plaintiffs lacked the same diligence. The Bureau has attempted to lay out a full and complete recounting of the parties' respective engagement with discovery in this case at pages 2-22 below, because the present dispute arises as a direct consequence of Plaintiffs' prior inaction and poor planning, which they have now unfairly and improperly tried to make the Bureau's emergency. Instead of promptly addressing issues in an orderly fashion as they arose over the twenty-two months this case has been pending, Plaintiffs' counsel opted to pack a whole host of discovery disputes and requests into these final weeks of discovery. But a party "cannot satisfy the diligence requirement, after eight months of inactivity, by jamming all his requests into the two to three months before the discovery deadline." *Mayes*

*v. Kaiser Foundation Hosp.*, No. 12-1726, 2014 WL 412755, at *2 (E.D. Cal. Feb. 3, 2014).  At pages 3-5, the Bureau addresses the first of the five specific questions the Court asked the Bureau to address in its June 14, 2020 Minute Order.  At pages 23-31, the Bureau provides the substance of its legal argument as to why this Court should grant its Motion for a Protective Order and why good cause does not exist to extend the present case schedule.  And at pages 31-38, the Bureau addresses the remaining four questions the Court asked the Bureau to address in its Minute Order.

The Bureau asks that this Court limit the Bureau's obligation to respond to Plaintiffs' requests to (1) the documents the Bureau agreed to produce as part of targeted collections of documents described in the Bureau's responses and objections to Plaintiffs' various document requests and in the Bureau's July 8, 2020 response to Plaintiffs' June 26, 2020 letter regarding alleged inadequacies in responses to requests served before June 15, 2020, and (2) responsive, non-privileged documents identified from the set of approximately 25,000 documents the Bureau is currently reviewing consistent with a July 6, 2020 proposal the Bureau made to Plaintiffs regarding a search of electronically stored information ("ESI").

## **BACKGROUND**

### A.  **Plaintiffs serve their first discovery requests and the Bureau responds.**

Discovery in this matter commenced on January 17, 2019, when the parties held their first conference under Federal Rule of Civil Procedure 26(f).  *See* Dkt. 10; *see also* Fed. R. Civ. P. 26(d)(2); Min. Order (Jan. 28, 2019).  More than seven weeks later, Plaintiffs on March 13, 2019 served 62 document requests in their First Set of Requests for Production of Documents and Things ("Plaintiffs' First RFPs"), attached as Ex. 1.  On March 26 and April 2, 2019, the parties met and conferred to discuss Plaintiffs' First RFPs and the Bureau's position with respect

to each request.  At these teleconferences, Plaintiffs' counsel repeatedly stated that their priority was obtaining "data" (which the Bureau understood to be a reference to, *e.g.*, race and gender identity information, salary and bonus history, position and pay grade information, records of promotions, resumes, and performance reviews) for putative class members and comparators. Together the parties negotiated and reached many agreements regarding the scope of what the Bureau would produce.  Plaintiffs also agreed that many requests were vague or duplicative and agreed that the Bureau could stay certain requests or that certain requests were subsumed by others.  The Bureau memorialized those discussions, the parties' agreements, and its various objections in writing on April 15, 2019, specifically inviting Plaintiffs to have further conversations "to the extent Plaintiffs disagree with agreements or representations referenced" by the Bureau.  *See* Defendants' Responses and Objections to Plaintiffs' First RFPs, attached as Ex. 2.

Because many of Plaintiffs' requests on their face broadly sought "all documents regarding" numerous topics, the Bureau objected to such requests as unduly broad and overly burdensome to the extent that responding would require extensive, keyword-based searches of the records of potentially hundreds of employees and millions of documents, such as searches of numerous employees' custodial files and e-mail correspondence over long periods of time.[1]  For instance, Plaintiffs' Request No. 5 requested "*[a]ll* documents regarding *any* testing, analyses, reports, studies, or adverse impact or disparate impact analyses" regarding a vast array of topics, including "the compensation plan, training opportunities, reasonable accommodation,

---

[1] The Court's Minute Order of July 14, 20200 identified five issues for the Bureau to address in the context of this Motion.  The following discussion addresses the first issue identified by the Court ("the grounds for [the Bureau's] initial objection to the production of electronically stored information ('ESI')").  The four remaining issues are addressed below in the Bureau's Argument, Section D.

performance reviews and evaluations, detail opportunities, and conversion from term appointments to permanent."  Ex. 1 at 7 (emphasis added).  Accordingly, as the Bureau stated in making its burden objection, "[b]ecause the request seeks 'all documents regarding' various types of studies, it potentially seeks a large number of documents discussing or mentioning any such study.  Finding such documents, to the extent that they exist, would require searching through the documents of potentially every Bureau employee going back several years."  The Bureau therefore responded that, "[p]ursuant to the Parties' Conferences," it would produce only "documents *sufficient to show* any formal testing, analyses, reports, or studies of the type described in Request 5," and provided a list of the kinds of documents it intended to provide, "including Inspector General reports, Government Accountability Office reports, studies that were produced in the Report of Investigations produced in the administrative cases underlying this matter, and Annual Employee Survey results for Consumer Response Specialists."  Ex. 2 at 7 (Request No. 5) (emphasis added).

The Bureau asserted similar burden objections to every other request by Plaintiffs that, on its face, similarly would have required unreasonably broad and unduly burdensome searches of millions of the Bureau's ESI records over a ten-year period.  *See, e.g.*, Ex. 2 at 4-5 (Request No. 2) (objecting that Plaintiffs' request "would require a laborious process of searching hundreds of employees' documents"); *id.* at 6 (Request No. 3) ("Finding such documents . . . would require searching through the documents of a very large number of Bureau employees"); *id*. at 8 (Request No. 8) ("Finding such documents would require searching through the documents of all supervisors of Consumer Response Specialists going back several years"); *id*. at 10 (Request No. 11) ("Locating complaints that are not informal or formal complaints regarding EEO discrimination made to the Bureau's Office of Civil Rights, to the extent that they exist, would

require searching the correspondence of all Consumer Response Specialists, as well as all

managers, for the entire time period at issue").

      Consistent with these responses, the Bureau agreed to produce those documents that

would not require broad and unduly burdensome searches of ESI and other information to locate,

but which could instead be located by less burdensome targeted searches or collections.  In

particular, the Bureau agreed to produce, among other things: (1) specific data regarding putative

class members and comparators, including salary history, pay grade, position titles, and race and

gender identity information; (2) specific personnel documents regarding putative class members

and comparators, such as SF-50 personnel action forms, position descriptions, resumes, and

performance evaluations; (3) documents sufficient to show Bureau policies governing relevant

personnel matters; (4) specific information about EEO complaints involving "Consumer

Response Specialists," and (5) other categories of specifically identified documents, such as

organizational charts, strategic plans, and various reports or studies of workforce demographics

or Bureau diversity and anti-discrimination efforts.[2]  At no time during this process did the

parties discuss search terms, custodians, or any other parameters for a broad-based search of

Bureau e-mails or other ESI that might be responsive to Plaintiffs' First RFPs.

**B.  The parties seek mediation.**

      On May 6, 2019 (fourteen days before the then-operative May 20, 2019 deadline for

Plaintiffs to file their motion for class certification), Plaintiffs' counsel requested that the Bureau

consent (for the second time) to request an extension of Plaintiffs' class certification motion

deadline.  *See* E-mail from Plaintiffs' counsel to Bureau counsel (May 6, 2019), attached as Ex.

---

[2] Although the Bureau has included as Exhibit 2 its complete Responses and Objections to
Plaintiffs' First RFPs, the Bureau has also attached, for purposes of reference, a table excerpting
each sentence in which the Bureau agreed to produce responsive materials.  *See* Exhibit 3.

4, at 1; *see also* Dkt. 14 (Plaintiffs' first motion for extension).  Consistent with the parties'

March and April 2019 conferences, and Plaintiffs' emphasis on obtaining employee data (such as

salary history and other information) to support their certification motion, Plaintiffs' counsel

explained that they based their extension request "on the assumption that [Plaintiffs] will obtain

the data soon."  *Id.*  Plaintiffs' counsel further stated that Plaintiffs "may need to go with a later

date" if the Bureau "need[ed] more time on the data."  *Id.*  Plaintiffs' counsel did not challenge

the Bureau's objections in its April 2019 responses and objections, nor did Plaintiffs express any

disagreement with the Bureau's characterization of the agreements the parties had reached.

Plaintiffs' only stated rationale for extension was the fact that the Bureau had yet to produce

compensation and other personnel data regarding putative class members and comparators.

Shortly thereafter, the parties jointly requested that the case be referred to mediation.  *See*

Dkt. 22.  The parties mutually agreed to stay further discovery responses on certain requests

pending mediation (by this point, the Bureau had served its own First Requests for Production

and First Sets of Interrogatories on Plaintiffs in April 2019), while continuing to produce the

remaining categories of documents and responses during the course of mediation.  The parties

also agreed "to provide full and complete discovery responses and document productions

regarding all requests no later than 30 days after the termination of any stay."  Letter from

Bureau Counsel to Pls' Counsel (May 9, 2019), attached as Ex. 5, at 2.

### C. The parties enter mediation and the Bureau requests clarification of Plaintiffs' putative class and class theories.

During the course of the mediation stay, the parties continued to exchange discovery.

The Bureau provided the employee data and other individual personnel records as requested by

Plaintiffs, such as performance reviews, resumes, and position descriptions, for a set of 113

putative class employees and comparators whose titles contained the phrase "Consumer

Response Specialist," in keeping with the Bureau's understanding at the time of the scope of Plaintiffs' alleged class.

As a result of the parties' October 23, 2019 formal mediation session, *see* Dkt. 25, however, the Bureau became concerned that Plaintiffs might ultimately seek to define their class in a way that rendered the identified group of 113 employees either over- or under-inclusive (or both), depending on the specific policies or practices that Plaintiffs might ultimately identify as forming the common questions of law or fact for the class (which Plaintiffs still have yet to do). The Bureau then sent Plaintiffs a letter expressing its concern that although Plaintiffs' Complaint identified a putative class limited to "Consumer Response Specialists," the Bureau had come to understand that "Plaintiffs may nevertheless attempt to represent employees in the Bureau's Consumer Response Division whose positions do not include 'Consumer Response Specialist' in the title."  Letter from Bureau Counsel to Pls' Counsel (Nov. 27, 2019), attached as Ex. 6, at 2.[3] The Bureau therefore requested that "Plaintiffs identify the position titles and employees that may fall within the putative class," and reminded Plaintiffs that the Bureau had already produced significant volumes of information that could assist in identifying class members.  *See id.* ("The organizational charts and voluminous other materials the Bureau has produced provide significant information on the various positions employees have held throughout the [Bureau's Office of Consumer Response].").  The Bureau further stated that, upon obtaining clarification from Plaintiffs on the scope or definition of the class, it would "supplement and modify its prior discovery responses and objections if and as appropriate, consistent with its understanding of Plaintiffs' evolving claims."  *Id.*

---

[3] In its letter the Bureau stated that "[a]lthough the parties are currently in mediation . . . we do not view this letter as a mediation-related communication."  Ex. 6, at 1 n.2.

On December 19, 2019, as the parties were preparing to end their mediation effort and negotiate a new case schedule, and having not received the requested clarification, the Bureau sent Plaintiffs a second letter, asking again "that Plaintiffs respond as soon as possible to [the Bureau's] November 27, 2019 request for clarification regarding their claims and theories so that any litigation schedule entered by the Court is not delayed."  Letter from Bureau Counsel to Pls' Counsel (December 19, 2019), attached as Ex. 7, at 1.  On January 22, 2020, the Bureau sent Plaintiffs a *third* letter regarding this issue.  *See* Letter from Bureau Counsel to Pls' Counsel (January 22, 2020), attached as Ex. 8.  In that letter, in an effort to assist the parties in reaching agreement on a new case schedule, the Bureau detailed its anticipated schedule for producing documents after the mediation stay ended.  In particular, the Bureau notified Plaintiffs that, in light of their failure to respond to the Bureau's requests to clarify the scope of the class, it intended to "supplement its previous productions with data for *all non-supervisory employees* in its Office of Consumer Response," in other words, not just those that had "Consumer Response Specialist" in their titles.  *Id.* at 2 (emphasis added).  As the Bureau explained, this supplemental production was made necessary by Plaintiffs' failure to respond to the Bureau's repeated requests that Plaintiffs clarify the nature of their class claims.  The Bureau stated that it did "not believe all the data or employees reflected [therein] are relevant to this litigation," but was "unable to evaluate their relevance with further specificity because Plaintiffs have failed to clarify their class contentions despite the Bureau's multiple requests."  *Id.*  Consistent with Federal Rule of Civil Procedure 26(a)(1)(A), the Bureau stated that it was producing this additional data because it had "determined that it may rely on [such] information . . . to show that [Plaintiffs' putative] class should not be certified or that the corresponding claims lack merit." *Id.*

8

The Bureau decided to make these voluntary productions to preserve its right to use the information in its defense, but also reasonably believed, based on Plaintiffs' prior conduct and statements, that such a production of additional information would preempt major discovery disputes in the future should Plaintiffs later claim they needed the information for class certification.  After the Bureau informed Plaintiffs on January 22 that it would be providing supplemental data on additional employees who did not hold the title "Consumer Response Specialist" (but for whom the Bureau felt the need to produce data so as to preserve its rights to potentially rely on such information in its defense), Plaintiffs' counsel appeared to confirm the Bureau's understanding of their priorities when they repeatedly emphasized that the case schedule would need to be driven by the Bureau's schedule to produce this data, because Plaintiffs "intended to sue [sic] our data analysis for class certification."  *Id.* at 2; *see also* Letter from Pls' Counsel to Bureau's Counsel (January 23, 2020), attached as Ex. 9, at 2 (Plaintiffs' counsel requesting that the Bureau provide "actual dates upon which the data will be produced and confirm that in the end we will have full data on every single person.") (emphasis added). The parties ultimately agreed to suggest a schedule under which fact discovery would close by July 31, 2020.  Dkt. 28.  On January 24, 2020, the mediation stay was lifted.  Dkt. 27.

### D.  After mediation, the Bureau produces more than 37,000 additional pages of documents.

After the mediation stay was lifted, and consistent with the parties' prior agreement to complete outstanding discovery responses and document productions within 30 days of the mediation stay being lifted, the Bureau began producing additional documents.  In February, the Bureau made four rolling productions totaling over 10,000 pages.  *See* Letter from Bureau Counsel to Pls' Counsel (February 3, 2020), attached as Ex. 10; Letter from Bureau Counsel to Pls' Counsel (February 10, 2020), attached as Ex. 11; Letter from Bureau Counsel to Pls'

Counsel (February 14, 2020), attached as Ex. 12; Letter from Bureau Counsel to Pls' Counsel (February 20, 2020), attached as Ex. 13.  The Bureau notified Plaintiffs in each of its production cover letters whether the documents being produced were in response to Plaintiffs' First RFPs or, instead, as part of the Bureau's voluntary supplemental production of data the Bureau had addressed in its January 22 letter.  *See id.*  In particular, in its February 20, 2020 cover letter, the Bureau formally notified Plaintiffs that it had completed its production of documents responsive to Plaintiffs' First RFPs.  *See* Ex. 13, at 1-2 (stating that the Bureau had completed its production of "all documents that it ha[d] been able to locate that are responsive to Plaintiffs' First Requests for Documents and Things, consistent with the parties' [conferences], and as reflected in the Bureau's April 15, 2019 Responses and Objections.").  Plaintiffs did not then, or in the weeks and months that followed, assert any challenges to the completeness or adequacy of the Bureau's production in response to their First RFPs.  Less than a week later, on February 26, 2020, Plaintiffs issued their Second Set of Requests for Production of Documents and Things ("Plaintiffs' Second RFPs").  *See* Ex. 14.

In productions dated March 11 and 26, 2020, the Bureau completed its voluntary *supplemental* production of data for the additional employees identified in its January 22, 2020 letter, producing over 20,000 additional pages to Plaintiffs.  *See* Letter from Bureau Counsel to Pls' Counsel (March 11, 2020), attached as Ex. 15; Letter from Bureau Counsel to Pls' Counsel (March 26, 2020), attached as Ex 16.  These productions were clearly identified in the cover letters as part of the Bureau's supplemental productions, and not as a response to Plaintiffs' First RFPs.  In addition, consistent with its duty to supplement under Rule 23(e), the Bureau produced to Plaintiffs newly created documents responsive to Plaintiffs' First RFPs that did not exist at the time of the Bureau's initial collection, such as employees' Fiscal Year 2019 performance reviews

and 2019 W-2 tax forms.  Ex. 16, at 3.  Again, each production was accompanied by a cover letter describing these categories of documents and specifying whether they were being produced in response to Plaintiffs' First RFPs or, instead, as part of the Bureau's voluntary supplemental production of data.  *See* Exs. 15-16.

On March 27, 2020, the Bureau served its Responses and Objections to Plaintiffs' Second RFPs.  *See* Ex. 17.  In contrast to its Responses and Objections to Plaintiffs' First RFPs, the Bureau explicitly agreed to conduct keyword-based searches of e-mails in response to certain of Plaintiffs' new requests that were reasonable and appropriately tailored to find relevant information, and stated it would provide Plaintiffs with proposed parameters for such a search. *Id.* at 2.  On April 17, 2020, the Bureau then sent a letter to Plaintiffs proposing the particular ESI search parameters with respect to two of the requests in Plaintiffs' Second RFPs, to which Plaintiffs never responded or objected.  *See* Letter from Bureau Counsel to Pls' Counsel (April 17, 2020), attached as Ex. 18.  In that letter, the Bureau also notified Plaintiffs that it had determined that other ESI searches for certain *other* requests were too voluminous to even load onto a review platform, and attempted to negotiate a reasonable narrowing with Plaintiffs by providing Plaintiffs with a list of 57 supervisory employees in the Bureau's Office of Consumer Responses who were potential custodians, and asking Plaintiffs to identify the custodians and date ranges they requested be searched for documents responsive to Plaintiffs' other requests.  *Id.* at 2–3.  Plaintiffs never responded to this invitation to discuss or narrow.  Having received no response, the Bureau proceeded with its proposed ESI search parameters.  In two productions dated May 1 and May 15, 2020, the Bureau produced over 9,000 additional pages of documents in response to Plaintiffs' Second RFPs (including all responsive e-mails located according to the Bureau's proposed ESI search parameters).  *See* Letter from Bureau Counsel to Pls' Counsel

11

(May 1, 2020), attached as Ex. 19; Letter from Pls' Counsel to Bureau Counsel (May 15, 2020), attached as Ex. 20.[4]

Throughout this process, the Bureau made every effort to proactively raise and address potential discovery disputes that it could reasonably anticipate. As discussed above, due to Plaintiffs' refusal to clarify their class theories, the Bureau *voluntarily* produced substantial additional data for *any conceivably relevant employee* in the Office of Consumer Response, specifically "in order to avoid unnecessary delay of this litigation," which might have resulted if Plaintiffs later clarified their class theories to render some subset of these employees relevant. Ex. 8, at 2. This involved substantial additional work by the Bureau to identify and produce full sets of data and other related documents (such as resumes, performance reviews, position descriptions, or training histories) for an additional 132 employees. The Bureau nonetheless voluntarily undertook this effort as a direct result of Plaintiffs' failure to clarify the contours of their class – despite the Bureau's repeated requests for such clarification, first made in November 2019 – and to pre-emptively avoid future discovery disputes and unnecessary litigation delay should the Bureau later find it necessary to rely on such data in its defense.

It is also worth noting that the Bureau went out of its way to flag for Plaintiffs issues, whether large or small, that the Bureau reasonably anticipated might be the subject of dispute. For instance, in the parties' January 15, 2020 conference, Bureau counsel notified Plaintiffs that it had omitted from its previous productions data for employees who held "Consumer Response

---

[4] On June 26, 2020, Plaintiffs sent the Bureau a deficiency letter "per the Court's June 23 Order," which required the parties to "identify to the opposing party any discovery request prior to June 15, 2020 for which the party disputes the adequacy of the response." Letter from Pls' Counsel to Bureau's Counsel (June 26, 2020), attached as Ex. 21 at 1; Minute Order of June 23, 2020. In that letter Plaintiffs did not assert any challenge regarding the adequacy of the Bureau's responses to Plaintiffs' Second RFP and therefore have waived their opportunity to raise any such challenge.

Specialist" titles but had never been assigned to the Office of Consumer Response (where named

Plaintiffs work or worked) to give Plaintiffs the opportunity to request that data if they believed

those employees to be relevant to the class. *See* E-mail from Bureau counsel to Pls' counsel to

(January 16, 2020), attached as Ex. 22.  Similarly, in its February 20, 2020 letter, the Bureau

notified Plaintiffs that it had understood Plaintiffs to seek "only strategic plans for the Bureau as

a whole," but requested that Plaintiffs clarify whether they also sought "strategic plans for

individual components of the Bureau."  Ex. 13, at 2 n.2.  However, Plaintiffs never addressed

this issue (which the Bureau raised in February) until Plaintiffs served their deficiency letter of

June 26, 2020.  Ex. 21 at 11–12.

### E. The Bureau seeks the Court's intervention in May 2020 regarding Plaintiffs' refusal to provide discovery responses.

After the parties exited mediation and resumed litigation of this case in late January, the

Bureau reminded Plaintiffs of their own obligations with respect to the parties' previous, pre-

mediation agreement that "the parties agreed to respond to pending discovery requests [by

February 23, 2020]."  Ex. 8 at 2.  As discussed above, the Bureau took that promise seriously,

working throughout January and February to meet the parties' agreed deadline, and completing

its production of documents responsive to Plaintiffs' First RFPs on February 20, 2020.  On

February 11, 2020, the Bureau also sent Plaintiffs a letter outlining deficiencies and inadequacies

in the responses Plaintiffs had served during the mediation stay in July 2019, and asked Plaintiffs

to respond to or remedy those deficiencies.  Letter from Bureau Counsel to Pls' Counsel

(February 11, 2020), attached as Ex. 23.

Plaintiffs, however, did neither.  Throughout February, March, April, and May 2020, the

Bureau repeatedly pressed Plaintiffs for a commitment to provide their outstanding discovery

responses and productions as they had promised.  In particular, the Bureau asked that Plaintiffs

search for and produce documents from named Plaintiffs' personal e-mail accounts and to revise their deficient interrogatory responses.  As the remaining time for discovery began to dwindle, Bureau counsel specifically noted in a teleconference with Plaintiffs' counsel that even an unopposed request for an extension of the discovery schedule might not be granted unless the parties could show the Court that they had worked diligently to complete discovery to the extent feasible.  Plaintiffs nevertheless failed to provide promised discovery responses or to respond substantively to the Bureau's deficiency letter, and also refused to commit to any schedule for doing so within the fact discovery period.  After further attempts at resolving these issues failed, the Bureau sought the Court's intervention pursuant to its Standing Order.  *See* Joint Statement to Judge Howell (May 22, 2020), attached as Ex. 24.  After this Court's intervention in late May, Plaintiffs finally provided revised interrogatory responses on June 17, 2020, but to date have still only produced (on June 18, 2020) a partial "rolling" response of 559 pages that included e-mail communications already in the Bureau's possession.

### F.   After the Court's May 27, 2020 hearing, Plaintiffs for the first time challenge the Bureau's April 2019 objections and issue broad new discovery requests.

On May 27, 2020, the Court held a hearing regarding the Bureau's request for assistance. *See* Minute Order of May 27, 2020.  At that hearing, Plaintiffs raised no outstanding complaints about the Bureau's previous discovery responses or productions.  To the contrary, if anything Plaintiffs appeared to complain about the volume of the Bureau's productions, and in particular its decision to voluntarily provide data regarding additional employees in the Office of Consumer Response.  *See, e.g.*, Dkt. No. 30, at 13:19–14:7; 15:3–14.

Starting the day after the May 27 hearing, however, Plaintiffs for the first time began challenging positions taken by the Bureau in its April 15, 2019 Responses and Objections.  Over the following days and weeks, Plaintiffs began citing numerous alleged "deficiencies" in the

Bureau's productions and the privilege log it served in February 2020.  *See* E-mail from Pls'
Counsel to Bureau Counsel (May 28, 2020) (metadata, custodians & privilege log) attached as
Ex. 25; E-mail from Pls' Counsel to Bureau Counsel (May 29, 2020) (privilege log) attached as
Ex. 26; Letter from Pls' Counsel to Bureau Counsel (June 2, 2020) (organizational charts),
attached as Ex. 27.  Some alleged "deficiencies" were the result of Plaintiffs' failure to fully
review the documents already produced, *see* E-mail from Bureau counsel to Pls' Counsel (June
5, 2020), attached as Ex. 28; others sought to withdraw the 14-month-old agreements Plaintiffs
had made or to challenge the Bureau's 14-month-old objections in connection with those
responses.  *See* Ex. 27; E-mail from Pls' Counsel to Bureau Counsel (June 4, 2020)
(congressional hearings) at Ex. 29.

The Bureau nonetheless promptly responded to Plaintiffs by providing clarification as to
why its prior productions were consistent with the parties' prior agreements and/or the Bureau's
prior objections, but, where appropriate and reasonable, also willingly provided supplemental
information or productions to respond to Plaintiffs' queries.[5]  During this time period, Plaintiffs
also (informally) noticed a 30(b)(6) deposition on multiple subjects, and the Bureau prepared and
produced a responsive witness in less than two weeks.  And although the Bureau had previously
explained to Plaintiffs the reason for, and nature of, its supplemental data productions numerous
times, it nonetheless provided a detailed, 8-page letter with exhibits in response to Plaintiffs'

---

[5] *See* Letter from Bureau Counsel to Pls' Counsel (June 2, 2020), attached as Ex. 30; *see also* Ex.
25, at 2 (Plaintiffs claim that the Bureau's metadata provided "Date Modified" information, but
that "the production does not include last modified time information"); *but see id.* (the Bureau
explains that "[t]he Bureau did provide 'last modified time information' . . . Specifically, the
metadata field "DATE_MOD" provides both a date and time."); Letter from Bureau Counsel to
Pls' Counsel (June 12, 2020) (supplemental production of metadata), attached as Ex. 31; Letter
from Bureau Counsel to Pls' Counsel (July 7, 2020) (supplemental production of unredacted
documents previously produced and data dictionaries) attached as Ex. 32.

request and the Court's May 27 Minute Order.  Letter from Bureau Counsel to Pls' Counsel

(May 29, 2020), attached as Ex. 33.

On June 3, Plaintiffs for the first time demanded that the Bureau conduct a broad,

keyword-based search of all electronically stored information (*e.g.*, e-mails, databases, Bureau

employees' social media, and the entirety of the Bureau's internal "intranet" system) that might

respond to Plaintiffs' First RFPs, and claimed to be "stunned to confirm that [the Bureau's]

production d[id] not . . . include the production of any [ESI]."  E-mail from Pls' Counsel to

Bureau Counsel (June 3, 2020), attached at Ex. 34, at 6.  Plaintiffs' "stunned" response is

puzzling, because the Bureau had already put Plaintiffs on notice, more than a year prior,

regarding its intent to *not* conduct broad collections of millions of documents and run keyword-

based searches of Bureau records to respond to requests that might have, on their face, called for

them.  *See* Ex. 2.  It had notified Plaintiffs that it completed its productions in response to

Plaintiffs' First RFPs and provided its privilege log more than three months prior, without any

objection from Plaintiffs.  Furthermore, Plaintiffs failed to identify which specific requests they

believed now required a broad-based ESI search, nor did they explain how their new ESI

demands were consistent with the parties' prior agreements (as reflected in the Bureau's

Responses and Objections to Plaintiffs First RFPs), nor did they articulate a legal view as to why

they believed the Bureau's previously stated objections were inappropriate.  *See* Ex. 34; Letter

from Pls' Counsel to Bureau Counsel (June 16, 2020), attached as Ex. 35.

While the Bureau did not believe it was obligated to make more than limited additional

productions given the Bureau's prior responses and objections, as well as the belated nature of

the Plaintiffs' demands, and the burden they would impose, the Bureau wished to amicably

conclude fact discovery without the need for further intervention from the Court.  Therefore, the

Bureau stated that it was willing to discuss with Plaintiffs the parameters of a reasonable ESI search of Bureau e-mails to locate additional responsive documents beyond those already provided.  *See* Ex. 34 at 3.

On June 16, Plaintiffs proposed wide-reaching search parameters, which included 13 custodians and numerous facially overbroad search strings for the entirety of the Bureau's nearly 10-year history.  Ex. 35.  Given the large volume of data requested, it took the Bureau nearly two weeks just to retrieve, index, and load all the custodial data onto its review platform.  The search parameters Plaintiffs proposed ultimately returned over 600,000 documents that the Bureau would have needed to review, an amount that would have been overburdensome even if requested months prior, let alone six weeks before the close of discovery.  *See* E-mail from Bureau counsel to Pls' counsel (July 1, 2020) at Ex. 36, at 28.  Additionally, on June 18 and 26, 2020, Plaintiffs served two *additional* sets of Requests for Production, totaling an additional 36 new requests, and a First Set of Interrogatories, further adding to the burden on the Bureau and the work the Bureau would need to complete before the July 31 deadline.  Plaintiffs' Third Set of Requests for Production of Documents and Things ("Plaintiffs' Third RFPs"), attached as Ex. 37; Plaintiffs' Fourth Set of Requests for Production of Documents and Things ("Plaintiffs' Fourth RFPs"), attached as Ex. 38; Plaintiffs' First Set of Interrogatories, attached as Ex. 39.

On June 18, the parties met and conferred in anticipation of filing their June 19 status report.  Afterwards, the Bureau sent Plaintiffs a proposed status report and discovery plan which did not extend the current discovery schedule, making clear that although the Bureau was willing to undertake reasonable ESI searches in an effort to amicably resolve this dispute, it would necessarily have to "calibrate the reasonableness of the search and the burden on the Bureau in light of the time remaining on the discovery calendar."  E-mail from Bureau Counsel to Pls'

17

Counsel, (June 18, 2020) at Ex. 40, at 2.  The following day, the parties exchanged

correspondence and met and conferred for several hours discussing the Bureau's concern that it

could not fulfill Plaintiffs' belated discovery demands in the time remaining in the discovery

schedule.  At that time, the Bureau believed that even with a substantial commitment of

additional resources (and assuming final agreement on search parameters could be reached

expeditiously), it could review for responsiveness and production no more than 40,000

documents (which would likely mean a review of more than 100,000 *pages* of documents).

Plaintiffs refused to agree to narrow the scope of their discovery demands to what could the

Bureau believed could reasonably be reviewed and produced by the July 31 discovery deadline

and, instead, argued that the parties should once again request an extension from the Court,

though they did not ultimately seek one.  *See generally* E-mail from Bureau Counsel to Pls'

Counsel (June 23, 2020), attached as Exhibit 41.  The Bureau voiced its concern that that failure

to reach agreement to reasonably cap the scope of the search would likely create an intractable

dispute but agreed, at Plaintiffs' urging, that the parties raise these issues to the Court only if and

when attempts at negotiation of a reasonable search (which would become possible after so-

called "hit" reports became available) failed and a dispute crystallized into more concrete form.

*Id.*

Beginning several days after this conference, the Bureau was able to provide rolling "hit"

reports to Plaintiffs as custodian data was loaded.  Those preliminary reports immediately made

clear that Plaintiffs' June 16 proposed search parameters were significantly overbroad because,

for instance, just one of Plaintiffs' over thirty search strings, applied to a single custodian,

yielded more than 100,000 documents including families.  E-mail from Bureau Counsel to Pls'

Counsel (June 25, 2020), attached at Ex. 42, at 14.  The Bureau initially proposed that the parties

agree to promptly seek Court intervention if the parties failed to reach final agreement on search parameters by July 2. At the time, the Bureau estimated such a schedule would leave sufficient time for the Bureau to review up to 40,000 documents, given the additional staff it could commit and the time available before the July 31 deadline. However, even after the overbreadth of the June 16 parameters became obvious, Plaintiffs did not provide a first revised proposal until July 6, which still would have required the review of over 300,000 documents. *See* E-mail from Pls' Counsel to Bureau Counsel (July 8, 2020), attached as Ex. 43; E-mail from Bureau Counsel to Pls' Counsel (July 8, 2020), attached as Ex. 44. Plaintiffs' final search proposal (provided to the Bureau on July 8, 2020) would require the Bureau to review over 160,000 documents, which the Bureau estimates would require approximately 3,200 person-hours of review time—equivalent to 10 attorneys reviewing documents full-time, 40 hours per week, for 8 weeks. *See* Letter from Pls' Counsel to Bureau Counsel (July 8, 2020), attached as Ex. 45; E-mail from Bureau Counsel to Pls' Counsel (July 9, 2020), attached as Ex. 46. Because the time spent attempting to reach a reasonable agreement on search parameters had cost the Bureau a week of the time it had hoped to devote to actual review, the Bureau concluded that the number of documents it could feasibly review before July 31 had been reduced to 25,000 documents, which the Bureau estimates would involve a commitment of at least 500 person-hours of document review.

On July 6, with no agreement in sight and the July 31 deadline rapidly approaching, the Bureau attempted to expedite the negotiation by sending Plaintiffs its own ESI proposal, which selected from among the custodians proposed by Plaintiffs, and narrowed Plaintiffs' search parameters to terms which the Bureau believed in good faith would return a higher percentage of relevant material. E-mail from Bureau Counsel to Pls' Counsel, attached as Ex. 47, at 1-2, 7-13. The Bureau's proposal produced a total hit count of 24,876 documents (including families),

which matched the Bureau's estimated capacity in the time remaining to review and produce documents. *Id.* at 7.  Plaintiffs responded by stating they would not agree to the Bureau's proposal, would not agree to remove any of their proposed custodians, and "objected to any unilateral review of custodians and documents that Plaintiffs have not agreed upon."  Letter from Pls' Counsel to Bureau Counsel (July 6, 2020), attached as Ex. 43, at 4.  In an attempt to resolve as much of this dispute as possible, the Bureau separately agreed to Plaintiffs' request that the Bureau produce the entirety of Plaintiffs' Bureau e-mail boxes (subject to the granting of a revised clawback order), despite the extremely overbroad nature of that request, and even though Plaintiffs had waived this issue by their failure to raise it in their June 26 letter identifying all remaining disputes concerning discovery requests served prior to June 15, 2020.  However, the Bureau's concession on this point did not resolve the parties' dispute, and indeed, Plaintiffs now ask this Court to require the Bureau to review the more than 600,000 documents identified in their June 16 request, which the Bureau estimates would consume 13,240 hours of review time— or the equivalent of 13 attorneys reviewing documents full-time, 40 hours per week, for six months.  *See* E-mail from Pls' counsel to Judge Howell (July 10, 2020), attached as Ex. 48, at 4.

### G.  Plaintiffs' Deficient Responses to the Bureau's April 2019 RFPs and Interrogatories

Even as Plaintiffs have pushed aggressively to impose significant new discovery demands on the Bureau, they have still not fulfilled their responsibility to complete a search and review of the two named Plaintiffs' personal e-mail accounts and other personal records in response to the Bureau's First RFPs, served over a year ago.  Further, their revised Interrogatory answers, which they provided on June 17, 2020 following this Court's intervention, address some of the deficiencies the Bureau pointed out to them in February 2020, but continue to include others.

On June 17, Plaintiffs provided the Bureau with their supplemental interrogatory answers.  *See* ("Jones Supplemental Interrogatory Answers"), attached as Ex. 49; ("Paz-Chow Interrogatory Answers"), attached as Ex. 50.  While Plaintiffs' June 17 responses did expand upon their prior answers, significant material deficiencies remain, which the Bureau memorialized on June 26.  *See* Ex. 21.  For instance, to cite some of the more significant examples, nearly all of Plaintiffs' supplemental responses object to the extent the Bureau seeks "information regarding putative class members."  *See, e.g.*, Ex. 49, at 6-7; Ex. 50, at 4-6. The authorities Plaintiffs cited in support of this objection concerned discovery that would subject absent class members to the burdens of discovery *directly*, but the Bureau has propounded no such discovery on absent class members.  Rather, the Bureau's requests require Plaintiffs to respond based on knowledge and information currently available to them and their counsel. Even more concerning, during teleconferences with Plaintiffs' counsel, the Bureau understood for the first time that Plaintiffs' counsel were taking the position that the Interrogatory responses need contain only information currently *personally* known to their clients, and not information known to their counsel.  This is inappropriate because "[a] party clearly cannot refuse to answer interrogatories on the ground that the information sought is solely within the knowledge of [her] attorney."  *Olmert v. Nelson*, 60 F.R.D. 369, 370 n.2 (D.D.C. 1973); *see also Tavoulareas v. Piro*, 93 F.R.D. 11, 21 (D.D.C. 2018).

Regarding Interrogatory to Ms. Jones No. 11, which requests that Ms. Jones identify "all common questions of law and fact shared by members of the purported class action in this matter," Ms. Jones stated that she believes she has responded to this request through the general information in her complaint (which does not, as required by this Court's Local Civil Rule 23.1(a), contain any section "under a separate heading" that identifies the purported common

questions of law and fact), information in an audio-visual presentation Plaintiffs made at mediation, and information Plaintiffs anticipate producing in the future in an expert report.  *See, e.g.,* Ex. 23 at 9; Letter from Pls.' Counsel to Bureau Counsel (Apr. 15, 2020), attached as Ex. 51, at 2-3. The Bureau maintains its position that Plaintiffs' reliance on their complaint, as well as on materials presented within the confidentiality confines of mediation (but not physically provided), and on as-yet unproduced expert materials, is inappropriate and does not constitute an adequate or appropriate response to any of the Bureau's outstanding discovery requests.

To date, Plaintiffs maintain they are standing by their position that they have provided full, complete, and accurate responses based on the current knowledge of their clients and do not plan to supplement their responses in response to the Bureau's June 26 letter.  *See* Ex. 47 at 4-5.  In a recent meet and confer Plaintiffs' counsel indicated they would clarify in writing their position on this issue, but have yet to do so.  The Bureau has not yet specifically asked this Court for relief in connection with these disputes, because it remains engaged in these discussions with Plaintiffs and hopes to reach amicable resolutions of these (and other) disputes.  However, the Bureau stands ready to file a joint e-mail and fully brief this Court or file a Motion to Compel, if the Court would like to address these disputes now.

### H.  The Bureau Seeks Court Intervention Regarding the Permissible Scope of Plaintiffs' Discovery Demands

Because it was clear that the scope of Plaintiffs' unjustifiably tardy new discovery requests and demands, if not sharply limited, would impose an undue burden on the Bureau and require an extension of the current schedule, the Bureau sought the Court's intervention to resolve this dispute.

# ARGUMENT

### A.  Legal Standards

#### 1.  Discovery limitations under Federal Rule of Civil Procedure 26

The scope of discovery a party may obtain under Federal Rule of Civil Procedure 26 extends to "any nonprivileged matter that is relevant to any party's claim or defense."  Fed. R. Civ. P. 26(b)(1).  Following an amendment to Rule 26(b)(1) in 2015, that scope is limited to what is "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  In light of this recent amendment to Rule 26, "considerations of both relevance and proportionality now govern the scope of discovery."  *United States ex rel. Shamesh v. CA, Inc.*, 314 F.R.D. 1, 8 (D.D.C. 2016). These new proportionality factors under Rule 26(b)(1) "encourage judges to be more aggressive in identifying and discouraging discovery overuse and to make proportionality considerations unavoidable."  *Id.* (quotation marks and citation omitted).

With respect to a party's claim of undue burden, Rule 26 "directs courts to consider factors [such] as the importance of the issues raised in the action, the amount in controversy, the parties' access to the requested information, the parties' resources, the importance of the requested discovery to the case, and 'whether the burden or expense of the proposed discovery outweighs its likely benefit.'"  *Prasad v. George Wash. Univ.*, 323 F.R.D. 88, 91 (D.D.C. 2017) (citing Fed. R. Civ. P. 26(b)(1)."  In addition, as relevant here, courts must also consider whether "the party seeking discovery has had ample opportunity to obtain the information by discovery in the action."  Fed. R. Civ. P. 26(b)(2)(C)(ii).  If the court finds that the party has had such

opportunity, it "*must* limit the frequency or extent of discovery."  Fed. R. Civ. P. 26(b)(2)(C) (emphasis added).

While a court may limit discovery on its own initiative, Federal Rule of Civil Procedure 26(c)(1) also authorizes a party from whom discovery is sought to move for a protective order, which the court may grant "for good cause . . . in order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."  The moving party "bears the burden of making the showing of good cause contemplated by the rule, and therefore, must make a specific demonstration of facts in support of the request as opposed to conclusory or speculative statements about the need for a protective order and the harm which will be suffered without one."  *Smith v. Yeager*, 322 F.R.D. 96, 99 (D.D.C. 2017) (quotation marks and citations omitted).  If the court grants such a motion, it may issue an order:

> (A) forbidding the disclosure or discovery;
> (B) specifying terms, including time and place or the allocation of expenses, for the disclosure or discovery;
> (C) prescribing a discovery method other than the one selected by the party seeking discovery; [and]
> (D) forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters[.]

Fed. R. Civ. P. 26(c)(1)(A)-(D).  As the Supreme Court has stated, these provisions under Rule 26(c) confer "broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required."  *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984).

A court's broad authority under Rule 26(c) is also reflected in the Advisory Committee Notes for Rule 34 (including notes addressing ESI discovery in particular), which state that "courts have ample power under Rule 26(c) to protect respondent against undue burden or expense, either by restricting discovery or requiring that the discovering party pay costs."  Fed.

24

R. Civ. P. 34, Advisory Committee Notes.  Even when the requested documents are relevant, Rule 26 provides courts with "significant flexibility and discretion to assess the circumstances of the case and limit discovery accordingly to ensure that the scope and duration of discovery is reasonably proportional to the value of the requested information, the needs of the case, and the parties' resources."  *Chen-Oster v. Goldman, Sachs & Co.*, 293 F.R.D. 557, 562 (S.D.N.Y. 2013), quoting The Sedona Conference, The Sedona Conference Commentary on Proportionality in Electronic Discovery, 11 Sedona Conf. J. 289, 294 (2010).  Even if a requested document is relevant, a court "must limit discovery if the request is 'unreasonably duplicative,' the requesting party has had 'ample opportunity to obtain the information by discovery,' or the 'burden or expense of the proposed discovery outweighs its likely benefit' considering the needs of the case and the importance of the documents."  *Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*, 297 F.R.D. 99, 102 (S.D.N.Y. 2013) (quoting Fed. R. Civ. P. 26(b)(2)(C)); *accord Chen-Oster*, 285 F.R.D. at 303 ("A party may . . . resist discovery of non-computerized documents or of ESI that is reasonably accessible on the ground that the discovery sought is disproportionate.").

### 2.  Scheduling modifications under Federal Rule of Civil Procedure 16

Under Federal Rule of Civil Procedure 16(b)(4), "[a] schedule may be modified only for good cause and with the judge's consent."  To show good cause, "the moving party must show both diligence and a lack of prejudice to the opposing parties."  *Richardson v. Yellen*, 323 F.R.D. 444, 446 (D.D.C. 2018).  The "primary measure of Rule 16's 'good cause' standard is the moving party's diligence in attempting to meet the case management order's requirements."  *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 625 (6th Cir. 2002) (quotation marks and citation omitted).  If the party seeking to extend a scheduling order to take untimely discovery "was not

diligent, the inquiry should end." *Dag Enterprises, Inc. v. Exxon Mobil Corp.*, 226 F.R.D. 95, 105 (D.D.C. 2005) (quoting *Integra Lifesciences I, Ltd. v. Merck KGaA*, 190 F.R.D. 556, 559-60 (S.D. Cal. 1999)).

### B. Plaintiffs' broad new discovery demands should be limited under Rule 26 because Plaintiffs have had ample opportunity to seek such discovery.

As a threshold issue, the Bureau has objected to Plaintiffs' discovery requests on the basis that their requests are unduly burdensome and not proportional to the needs of this case. Plaintiffs' current ESI discovery demands would require the Bureau to review more than 600,000 documents – which the Bureau estimates would require over 13,000 person-hours of review time, equivalent to 13 attorneys working on nothing but document review for six months.[6]

While a request of such magnitude is unduly burdensome on its face, it is particularly so given the extensive discovery the Bureau has already provided, including all the data (and then some) that Plaintiffs repeatedly have stated would form the basis of their certification motion, and Plaintiffs' continued failure to narrow or clarify the basic parameters of their proposed class and identify common questions of law or fact, which have frustrated the Bureau's ability to determine what discovery requests might be proportional to the needs of this case. To this day, Plaintiffs have refused to address the Bureau's repeated request – first made in November 2019 – that Plaintiffs define the contours of the purported class. They have also refused to identify the questions of law and fact common to whatever class they might be claiming (as requested by the Bureau in an interrogatory to Plaintiffs over a year ago, and as required under this Court's Local

---

[6] In the parties' July 10, 2020 joint statement to the Court, Plaintiffs asked that this Court order the Bureau to "produce ESI according to the custodians and searches set forth in Plaintiffs' June 16 ESI proposal." Ex. 48, at 18. As noted above, the Bureau notified Plaintiffs on July 1, 2020 that their ESI proposal returned more than 600,000 documents. Ex. 36, at 28.

Civil Rule 23.1), which might enable the parties to define the class and narrow the issues in this case, which (as pled) purports to involve at least eight distinct personnel policies and practices, as to an indeterminate group of employees in the Office of Consumer Response, over a roughly 10-year period of time.[7]  Without this basic information, the Bureau does not know if the class Plaintiffs seek to certify consists of 30 people or 300 people, nor does the Bureau know what documents would (or would not) help advance Plaintiffs' class theories.  The Bureau therefore cannot readily evaluate proportionality factors such as the "amount in controversy" (since it cannot determine the size of the putative class), the "importance of the discovery in resolving the issues" (since those issues remain unknown), or whether the "burden or expense" of Plaintiffs' requested discovery "outweighs its likely benefit" (since the Bureau does not know what discovery might be most critical in supporting Plaintiffs' as-yet unspecified class theories).  *See* Fed. R. Civ. P. 26(b)(1).

But this Court need not resolve this dispute on burden grounds alone.  Plaintiffs' squandering of their opportunities to conduct discovery since discovery in this case commenced in January 2019 constitutes a separate basis for limiting their last-minute discovery requests.  If this Court determines that Plaintiffs have already had "ample opportunity to obtain the information by discovery in the action," Rule 26 instructs that this Court "must limit the frequency or extent of discovery."  Fed. R. Civ. P. 26(b)(2)(C).

---

[7] While Plaintiffs did recently notify the Bureau of their intent to drop their gender-based Title VII and Equal Pay Act claims, they have not yet formally done so.  In any event, dropping such claims has not led them to adjust or withdraw a single discovery request they have made to the Bureau, though Plaintiffs did use it as an excuse to refuse to respond to several of the Bureau's own requests to them.  Further, the scope of this case remains enormous due to the sheer number and variety of personnel practices and policies the Plaintiffs contend were discriminatory and the temporal breadth of those claims.

Plaintiffs had ample opportunity to raise their new challenges or propound their new discovery requests long before the Court's May 27, 2020 hearing, but chose not to at every available opportunity.  Plaintiffs could have challenged the Bureau's discovery objections or its characterization of the parties' negotiated agreements shortly after Plaintiffs receiving those responses and objections in April 2019, but chose not to.  They also could have raised these issues during mediation (as the Bureau did with respect to Plaintiffs' deficient discovery responses), but chose not to.  Plaintiffs could have raised these issues in December 2019, when it was clear that the mediation stay would be lifted, but chose not to.  Plaintiffs also could have raised these issues in January 2020, when the parties were negotiating the case schedule or immediately after the mediation stay was lifted, but chose not to.

And even assuming – as Plaintiffs claim – that the Bureau's Responses and Objections did not sufficiently notify Plaintiffs of the Bureau's intent to not conduct broad-based ESI searches, Plaintiffs *were* most certainly put on such notice in February 2020, when the Bureau formally notified Plaintiffs that it had completed its production of documents responsive to Plaintiffs' First RFPs (a production for which the parties never discussed any ESI parameters). Plaintiffs also could have raised these disputes on February 26, 2020, when they served their Second Set of Requests for Production of Documents and Things, or when the parties discussed ESI search parameters for *those* requests.  And, with respect to deficiencies Plaintiffs have recently claimed regarding the Bureau's privilege log, Plaintiffs could have raised any such issue after the Bureau served that log on February 20.  Instead, Plaintiffs waited until after the Court's May 27, 2020 hearing to raise these and other issues that had been ripe for many months, and to raise new issues and serve broad new discovery requests.

28

**C. Plaintiffs' lack of diligence does not warrant the extension of this Court's scheduling order that would be required to satisfy their discovery demands.**

In their joint e-mail to this Court, Plaintiffs request that this Court order the Bureau to review the more than 600,000 documents under Plaintiffs' June 16 ESI parameters could require the full-time work of 13 attorneys working for six months.  Such a review certainly cannot be completed in the two weeks remaining until this Court's July 31 deadline and, therefore, would necessarily require a significant extension of the Court's scheduling order.  In support of such a modification, Plaintiffs would have to show "both diligence and a lack of prejudice to the opposing parties."  *Richardson*, 323 F.R.D. at 446.  Plaintiffs can show neither.

With respect to diligence, Plaintiffs cannot make any such showing, because they squandered the many "ample opportunit[ies]" they have had to conduct discovery over the long course of this case.  "Mere failure on the part of counsel to proceed promptly with the normal processes of discovery and trial preparation should not be considered good cause."  *Dag Enterprises, Inc.*, 226 F.R.D. at 105 (citation omitted).  Plaintiffs have attempted to compensate for their lack of diligence by imposing on the Bureau the consequences of their long-deferred discovery efforts.  If the "primary measure" of good cause is the "party's diligence in attempting to meet the case management order's requirements," *Inge*, 281 F.3d at 625, Plaintiffs have failed to meet that standard at every point in this case.  They have sought multiple extensions, not just of discovery but of multiple other deadlines.  In March 2019, they claimed "other pressing commitments" in seeking a six-week extension to file their class certification motion, which the Bureau did not oppose and which this Court granted.  Two weeks before that new deadline, Plaintiffs asked the Bureau to consent to a third extension, which was obviated only by the parties' request to seek mediation.  Ex. 4, at 1.  On December 20, 2019, Plaintiffs filed a motion to further extend the Court's mediation referral, a motion which the Bureau did not oppose, but

29

chose not to join.  *See* Dkt. 27.  The parties then filed a joint status report under which the parties

agreed to seek and were granted an additional six months of discovery.  At the time, the Bureau

had conveyed its view that such a lengthy period was excessive, but agreed to jointly request in

the interest of collegiality and accommodating Plaintiffs and their schedule.

Despite these serial extensions, Plaintiffs have been unable to meet the Court's case

management requirements.  Plaintiffs still have not completed their own fact discovery

obligations with respect to the Bureau's First RFPs, propounded in April 2019, which they

originally promised to provide to the Bureau five months ago, but have still not delivered.

Plaintiffs also failed to timely raise disputes regarding the Bureau's own diligent productions.

By any measure, such failures reflect a lack of diligence.  As a result, the consequences of

Plaintiffs' inaction and poor planning have now unfairly and improperly become the Bureau's

emergency, requiring it to redirect its limited staff and resources to identifying and preparing a

30(b)(6) witness on short notice, responding to numerous simultaneously raised discovery

disputes and large new discovery requests, addressing Plaintiffs' own discovery deficiencies, all

while also negotiating and attempting to conduct a substantial ESI search under a challenging

timeframe.  Instead of promptly addressing issues in an orderly fashion as they arose over the

long course this case has been pending, Plaintiffs' counsel opted to pack a whole host of

discovery disputes and requests into these final weeks of discovery.  But a party "cannot satisfy

the diligence requirement, after eight months of inactivity, by jamming all his requests into the

two to three months before the discovery deadline."  *Mayes v. Kaiser Foundation Hosp.*, No. 12-

1726, 2014 WL 412755, at *2 (E.D. Cal. Feb. 3, 2014).

Additionally, the Bureau would be prejudiced by further delay of this case.  The parties

are approaching the two-year anniversary of the filing of this Complaint, during which Plaintiffs

have sought broad-ranging class discovery, all without Plaintiffs demonstrating to the satisfaction of this Court that they have a certifiable class—a legal standard that *four previous neutral adjudicators* found they failed to meet during the administrative stage of this case, and a showing which this Court's rules ordinarily require a party to make within 90 days of filing.  The EEO complaint that eventually led to this litigation was filed over five years ago, in November 2014, and seeks to press claims related to essentially the entirety of the Bureau's 10-year existence.  The regular turnover of staff impedes the Bureau's ability to locate and interview witnesses, while also inevitably removing some of the institutional memory on which the Bureau relies for its defense regarding events that pre-date many of its existing employees.  Further extensions will only further undermine the Bureau's ability to defend itself, while thwarting its interest in the swift resolution of this case.

### D.  Defendants' responses to specific questions posed by the Court.

The following discussion responds to additional specific questions raised by the Court in its Minute Order of July 14, 2020.  The Bureau addressed the Court's first question (regarding its objections to the production of ESI) in its discussion above.  *See* n. 1, *supra*.

#### 1.  The Bureau's timeline to review 40,000 ESI documents[8]

The Bureau's primary legal team staffed to this case—while the largest defensive litigating team the Bureau currently has, consisting of three dedicated senior counsel, the one

---

[8] The following discussion addresses the second issue raised by the Court's Minute Order ("the date by which defendants could complete production of 40,000 pages of ESI").  The Bureau notes that in its negotiations with Plaintiffs, both parties have consistently focused on the number of *documents* identified by search parameters that the Bureau would review for responsiveness (from which it would then produce any and all responsive documents identified during its review of that set), as opposed to the number of *pages it could produce*.  The number of documents reviewed is a better predictor of the workload and burden, as a broad search that identifies few responsive documents and has many "false hits," and a targeted search that identifies a high

available contract attorney, and a dedicated supervising attorney—is still too small to feasibly perform all the work that would be necessary to respond to Plaintiffs' current discovery demands, even though several have cancelled summer vacation plans and are working substantial overtime in support of an all-out effort on this case.  Among other things, this team is simultaneously collecting documents and information to respond to Plaintiffs' Third and Fourth RFPs and First Interrogatories (all served within the last month), negotiating with Plaintiffs with respect to their own still incomplete or deficient discovery responses, preparing for depositions anticipated to occur in August, preparing this Motion, and potentially preparing for other motions practice that might be necessary as discovery winds down.  The primary legal team also has been responsible for training and supervising other attorneys who are conducting the first-level ESI document review (as described below) and would be responsible for conducting second-level ESI review and other privilege and quality-control review prior to production.

Consequently, the Bureau has asked all 30 attorneys (including supervisory attorneys and Deputy General Counsels) in its Office of Litigation & Oversight, which is responsible for all of the Bureau's defensive and appellate litigation in federal courts, and in the Labor and Employment group of its Office of General Law and Ethics, to commit any available time to assisting with the review.  These attorneys already have significant responsibilities and

---

percentage of responsive documents, might in the end yield an equal number of actual documents produced, but the former entails considerably more review work than the latter. The number of pages produced also cannot be predicted *ex ante* with certainty, as it will depend on the ultimate number of responsive documents returned by a set of search parameters and their length.  The Bureau therefore respectfully requests that any requirement for it to produce additional ESI to Plaintiffs be measured by the number of documents returned by search parameters that it agrees to review, rather than pages of materials ultimately identified as responsive.  The Bureau notes that the number of *pages* it is reviewing as part of its current review of approximately 25,000 documents is substantially larger than the number of documents it is reviewing, likely by a factor of 2-4x, since most documents consist of multiple pages.

caseloads, including managing approximately 18 active cases in federal court, with a large number of briefing deadlines in the coming six weeks; more than 25 active administrative and EEO cases or complaints; and nine pending arbitrations.  They also have a significant number of other important and pressing responsibilities, including advising the Bureau on litigation risk and employment law across a variety of issues, responding to oversight requests from Congress or the Government Accountability Office, and responding to third-party subpoenas and other third-party requests for the Bureau's privileged information, just to name a few.

As of 2:00 P.M. on the day of this filing, the Bureau had completed first-level review of 8,119 of the 24,876 documents (including families) returned by the search parameters it proposed to Plaintiffs on July 6, 2020.  Ex. 47.  The Bureau currently is making all possible efforts to complete this review by July 31, 2020, though due to fluctuations in attorney availability, the Bureau cannot state with absolute certainty that the review will in fact be complete by that date.  However, if the Bureau is required to review additional documents beyond the 24,876 documents to which it is already committed, the pace at which it is able to review documents will soon slow, because attorneys with primary responsibility for other matters cannot indefinitely prioritize this litigation over their other responsibilities, many of which also include court-ordered deadlines.  Consequently, if the Bureau were required to review 40,000 documents total (*i.e.*, an additional 15,000 documents on top of the documents it is already reviewing), it believes it could—with significant effort and commitment—produce all responsive documents by August 31, 2020.

### 2.  The Bureau's ability to meet the September 25 deadline for expert reports[9]

Despite the capacity limitations discussed above, the Bureau believes that, even were it required to review or produce additional ESI, it could meet the current September 25, 2020 deadline for initial expert reports on class certification, because the Bureau currently expects to designate only a rebuttal expert witness on class certification issues.  However, if the Bureau is required to conduct additional ESI review after July 31 and the current deadline for initial expert reports is not moved, the Bureau believes it would nonetheless be prejudiced because it would be required to spread its limited resources to simultaneously conduct a burdensome document review, while also preparing to take and defend depositions (which it only reluctantly agreed, at Plaintiffs' request, to push into August), and while also working to proactively engage with and educate its expert witness.  Several core team members also had planned to take vacations in August or early September, some which they had cancelled or postponed from June and July due to the heavy burden of responding to all of Plaintiffs' newly-raised issues and new requests. Because the Bureau made every effort to proactively raise and resolve discovery disputes as early as feasible, but could not due to Plaintiffs' lack of diligence, the Bureau would respectfully request that the Court consider the Bureau's limited capacity in setting any revised schedule.

### 3.  Congressional hearing testimony and transcripts[10]

Plaintiffs' assertion, first made on June 4, 2020, that the Bureau improperly failed to produce complete records for Congressional hearings regarding alleged discrimination at the

---

[9] The following discussion addresses the third issue raised by the Court's Minute Order ("whether defendants believe they can still meet the September 25 deadline for expert reports on class certification if they are required to produce 40,000 pages of ESI").

[10] The following discussion addresses the fourth issue raised by the Court's Minute Order ("why defendants have not yet completed production of requested congressional testimony and related documents").

Bureau in response to their First RFPs, *see* Ex. 29, is baseless.  Plaintiffs' First RFPs did not

clearly request the transcripts they now claim ought to have been produced, and such transcripts

*certainly* did not fit within the contours of the parties' documented agreements about how the

Bureau would respond to those RFPs, as memorialized in the Bureau's April 2019 responses and

objections.  When Plaintiffs first raised this issue in June 2020, the Bureau attempted to quickly

resolve it by pointing out that the transcripts and congressional hearing records Plaintiffs seek are

not even Bureau documents, but congressional ones; that official records of congressional

hearings are publicly accessible on the Internet; and that the Bureau was even willing to

download and send them to Plaintiffs to bring a quick end to this dispute.  Instead, Plaintiffs

chose to bring this dispute to the Court.

   After a request for clarification from the Bureau, the Plaintiffs claimed in a June 8, 2020

e-mail that it was their view that such transcripts or hearing records should have been produced

as responsive to their First RFPs, Requests No. 21, 35, 39, or 40.  The text of the requests and the

Bureau's prior responses make clear that Plaintiffs' claim is unfounded:

- Request No. 21 requested "all plans, reports, surveys, or data submitted to Congress or any governmental agency relating to the workplace demographics of CFPB."  But a congressional hearing record is not a "plan, report, survey, or data." Nor is it something the Bureau submits to Congress, and the hearing records that Plaintiffs appear to seek do not relate in whole (or even in the main) to "workplace demographics of CFPB."

- Request No. 35 requested "testimony of any CFPB manager or executive" regarding a series of topics generally related to discrimination.  However, as noted in the Bureau's April 2019 responses and objections, *see* Ex. 2 at 18, the parties agreed that the Bureau would respond to this request in accordance with its response to Request No. 17, for which the Bureau agreed to produce "copies of public speeches by the officials named" in Request No. 17; specifically, "Nancy Schroeder, Andrew Fay, James Brusselback, Angelique Reese, Cristopher Johnson, Dane D'Alessandro, and Scott Pluta."  The Bureau is aware of a series of congressional hearings related to the general topic of alleged discrimination or retaliation at the Bureau, which occurred on April 2, 2014, May 21, 2014, June 18, 2014, July 30, 2014, and June 25, 2015.  However, none of those named individuals testified at any of those hearings.

- Request Nos. 39 and 40 sought documents concerning any "charge, complaint, allegation, grievance and/or report, formal or informal, by any of Defendants' current or former employees" pertaining to discrimination or retaliation.  However, as the Bureau noted in its April 2019 responses and objections, *see id.* at 19, Plaintiffs agreed to stay both of those requests pending Plaintiffs' review of the Bureau's response to Request No. 11, and the Bureau never heard otherwise from Plaintiffs until after Plaintiffs' June e-mail.

The Bureau *had* previously produced parts of hearing records to the extent they included as exhibits documents that showed "formal testing, analyses, reports, or studies" regarding potential discrimination or disparate impact with respect to Bureau employees, which is what the Bureau agreed to produce in response to Request No. 5 in Plaintiffs' First RFPs.

The Bureau assumed Plaintiffs ultimately agreed that their First RFPs did not clearly request such transcripts, because they then requested, as part of their Third RFPs served on June 18, 2020, "[a]ll documents relating to any Congressional Hearings regarding discrimination and/or retaliation at CFPB[.]" Ex. 37, Request No. 1. The Bureau timely served its objections to those requests on July 8, 2020, and agreed to produce "any transcripts, official hearing records, written testimony, or correspondence between the House Financial Services Committee's Subcommittee on Oversight and Investigations and the Bureau concerning the testimony and hearings that were held by that Subcommittee on April 2, 2014, May 21, 2014, June 18, 2014, July 30, 2014, and June 25, 2015 that are located in the centrally maintained files of the Bureau's Office of Legislative Affairs or its Office of Litigation and Oversight."  The Bureau intends to provide any such responsive documents by July 31. Having done a review of those files, it notes that it does not appear that the Bureau possesses transcripts or hearing records related to most of those hearings, as the majority of them featured Bureau employees testifying in a personal or whistleblower capacity, and so the Bureau did not participate in those hearings or prepare, review, or submit those witnesses' testimony.  It nonetheless maintains its willingness, as it offered to Plaintiffs over a month ago, to send Plaintiffs a set of Internet links that will allow

them to download the complete and publicly available congressional hearing transcripts, hearing

record, and exhibits at their convenience.

### 4. Custodial metadata[11]

On May 28, 2020 (the day after this Court's May 27 hearing), Plaintiffs for the first time

raised a new dispute concerning the Bureau's production of "custodian" metadata in connection

with its productions in response to Plaintiffs' First RFPs—productions that, notably, had

commenced over a year prior in April 2019.  As described above, the vast majority of the

Bureau's productions to date have consisted of employee personnel data and other centrally

maintained documents, such as employee performance reviews, SF-50 records of official

personnel actions, official position descriptions ("PDs"), employee resumes, and the like.  The

Bureau appropriately listed the Bureau itself as the custodian of such documents (or effectively

listed the Bureau by leaving the "custodian" metadata field blank), because these files are

centrally maintained by the Bureau, rather than under the administrative control of a particular

employee (such as in individual e-mail files).  Bureau counsel believe this practice is consistent

with generally accepted e-discovery standards for centrally maintained files.  Plaintiffs have yet

to direct the Bureau to any authority holding that its practice of designating the Bureau as

custodian of centrally-maintained files not under the administrative control of any particular

employee is improper or inconsistent with typical e-discovery practice.

In addition, the Bureau does not "maintain" any other custodian or source data for other

previously produced documents, in the sense that such data is not innately associated with the

files that were collected nor immediately available for ready export for all 51,000 pages of

---

[11] The following discussion addresses the fifth issue raised by the Court's Minute Order
("whether defendants maintain custodian and source information for documents already
produced").

documents produced since April 2019.  Further, the Bureau believes that, given the marginal value of custodian or source information to Plaintiffs of, for example, an employee's official performance review, resume, or an SF-50 employment record, it would be disproportionally burdensome to retroactively collect such information for all previously produced documents. Further, the Plaintiffs' lack of diligence in raising this issue until June 2020, more than three months after the Bureau completed its productions in response to Plaintiffs' First RFPs and more than a year after those productions first commenced, supports the Bureau's position that retroactively re-collecting such metadata is overburdensome and disproportionate to the needs of this case.

In the course of investigating Plaintiffs' dispute, Bureau counsel did discover that certain metadata, including custodian metadata, had inadvertently been omitted from previous productions of e-mails in response to Plaintiffs' Second RFPs.  The Bureau agreed to remedy this oversight, and promptly did so by providing the metadata (including custodian metadata) for those e-mails in a supplemental production dated June 12, 2020.  The Bureau also offered that, in addition to its supplemental production of e-mail metadata, it would consider in good faith collecting and providing additional custodian or source information at Plaintiffs' request if Plaintiffs identified specific documents or categories of documents for which such information might have some identifiable relevance to this case.  *See* Ex. 25, at 3.  However, Plaintiffs have declined to date to identify any such documents or document categories.

## **CONCLUSION**

For the foregoing reasons, the Bureau requests that the Court issue an order limiting the scope of responsive, non-privileged information the Bureau must produce beyond what it already has produced in response to Plaintiffs' outstanding requests for production of documents to those

documents (1) the Bureau agreed to produce in its July 8, 2020 Combined Responses and

Objections to Plaintiffs' Third and Fourth Sets of Requests for Production, and the Bureau's July

8, 2020 response to Plaintiffs' June 26, 2020 deficiency letter addressing alleged inadequacies in

the Bureau's responses to discovery requests served prior to June 15, 2020; or (2) located

through the search described in the Bureau's July 6, 2020 ESI proposal to Plaintiffs.

Respectfully submitted,

/s/ Derick Sohn

Mary McLeod
   *General Counsel*
John R. Coleman
   *Deputy General Counsel*
Laura Hussain
   *Assistant General Counsel*
Thomas McCray-Worrall
   *Senior Counsel*
Allison Ziegler
   *Senior Counsel*
Derick Sohn
   *Senior Counsel*
Azmi F. Kazzi
   *Senior Counsel*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, D.C. 20552
(202) 435-7873 (telephone)
(202) 435-7024 (facsimile)
derick.sohn@cfpb.gov
*Counsel for Defendant*
*Consumer Financial Protection Bureau*

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CARZANNA JONES and HEYNARD L.
PAZ-CHOW, on behalf of themselves and
all others similarly situated,

          Plaintiffs,

    v.

KATHLEEN KRANINGER, in her official
capacity as Director, Consumer Financial
Protection Bureau, and CONSUMER
FINANCIAL PROTECTION BUREAU,

          Defendants.

Civil Action No.: 18-2132 (BAH)

**Chief Judge Beryl A. Howell**

## [PROPOSED] ORDER

Having considered the Motion for Protective Order filed by the Consumer Financial

Protection Bureau ("Bureau"), the Bureau's Memorandum in Support of its Motion, Plaintiffs'

Opposition to the Bureau's Motion, the Bureau's Reply, and all other papers filed in this

proceeding, the Court GRANTS the Bureau's Motion and hereby ORDERS that:

      1.     The scope of responsive, non-privileged information the Bureau must produce

beyond what it already has produced in response to Plaintiffs' outstanding requests for

production of documents is limited to (1) those documents the Bureau agreed to produce in its

July 8, 2020 Combined Responses and Objections to Plaintiffs' Third and Fourth Sets of

Requests for Production, and the Bureau's July 8, 2020 response to Plaintiffs' June 26, 2020

deficiency letter addressing alleged inadequacies in the Bureau's responses to discovery requests

served prior to June 15, 2020; and (2) documents located through the search described in the

Bureau's July 6, 2020 ESI proposal to Plaintiffs.

2.      The Bureau shall have no further obligation to respond to Plaintiffs' outstanding

requests for production of documents, apart from its duty to supplement the discovery responses

it has made as required under Federal Rule of Civil Procedure 26(e).


**SO ORDERED.**

**Date:** July __, 2020


                                              _____
BERYL A. HOWELL
Chief Judge