IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CARZANNA JONES and HEYNARD L. PAZ-CHOW, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br> v.<br><br>ROHIT CHOPRA, in his official capacity as Director, Consumer Financial Protection Bureau, and CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>    Defendants. | Civil Action No.: 18-2132 (BAH)<br><br>**Judge Beryl A. Howell**<br><br>**Jury Trial Requested** |

### PLAINTIFFS' UNOPPOSED MOTION FOR PROVISIONAL CLASS CERTIFICATION, PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT, AND APPROVAL/DISTRIBUTION OF NOTICE TO CLASS OF SETTLEMENT

Linda D. Friedman
(Admitted Pro Hac Vice)
George S. Robot (IL0047)
Truscenialyn Brooks
(Admitted Pro Hac Vice)
Caitlin M. Kearney
(Admitted Pro Hac Vice)
STOWELL & FRIEDMAN, LTD.
303 W. Madison St., Suite 2600
Chicago, IL 60606
(312) 431-0888
lfriedman@sfltd.com
grobot@sfltd.com

Justin L. Leinenweber
(Admitted Pro Hac Vice)
Justin L. Leinenweber, P.C.
120 N LaSalle St Ste 2000,
Chicago, IL 60618
Phone 312-857-3405
justin@ilesq.com

*Attorneys for Plaintiffs, on behalf of themselves and all others similarly situated*

August, 31, 2023

Plaintiffs, on behalf of themselves and all others similarly situated, by and through their attorneys, Linda D. Friedman, George S. Robot, Truscenialyn Brooks, and Caitlin M. Kearney of Stowell & Friedman, Ltd., and Justin L. Leinenweber of Justin L. Leinenweber, P.C., respectfully submit their proposed class settlement (the "Settlement") between the proposed class and Defendants the Consumer Financial Protection Bureau ("CFPB" or the "Bureau") and its Director, Rohit Chopra (in his official capacity), for preliminary approval by the Court. The Settlement provides a $6 million Settlement Fund[1] for Monetary Awards for a Class of 85 Black/African American and/or Hispanic Bureau employees in certain jobs within the Office of Consumer Response, administration costs, any court-approved attorneys' fees and costs, and any court-approved Service Awards.

The Settlement is fair, reasonable, and adequate, and easily satisfies the criteria for preliminary approval set forth in Federal Rule of Civil Procedure 23(e). Indeed, the Settlement was reached following expansive discovery including the exchange of over 100,000 documents, Rule 30(b)(6) and fact witness depositions, and expert analysis of Bureau compensation data. The Court oversaw a hard-fought discovery process, and two qualified neutrals oversaw the arm's length negotiations between the parties. Reached after nearly ten years of litigation, the Settlement is adequate, fair, and reasonable and meets the best interests of class.

Accordingly, Plaintiffs move the Court for certification of the class, preliminary approval of the Settlement, and approval and distribution of Notice to the Class.

---

[1] This motion incorporates by reference the definitions in the Settlement, attached as Exhibit 1, and all capitalized terms not defined herein shall have the same meanings as set forth in the Settlement.

1

**FACTUAL BACKGROUND AND SUMMARY OF SETTLEMENT TERMS**

## I. The Litigation

Heynard Paz-Chow ("Paz-Chow"), a Hispanic man, joined the Bureau in 2011 as a term employee on a non-permanent appointment. Carzanna Jones ("Jones"), a Black woman, joined the Bureau in 2012. Both had considerable relevant experience and expertise.

In 2014, Paz-Chow initiated Equal Employment Opportunity ("EEO") counseling with the Bureau's Office of Civil Rights to address his experiences of discrimination and retaliation. As the counseling process proceeded, Paz-Chow engaged Plaintiffs' counsel to represent him and a putative class. Subsequently, the Bureau informed him that his term appointment would not be converted to permanent status. Undaunted, Paz-Chow, through counsel, filed a putative class EEO administrative complaint with the CFPB's Office of Civil Rights alleging discrimination and retaliation on behalf of himself and all others similarly situated. He worked diligently throughout the administrative process by outlining the proposed class-wide discriminatory policies and practices, common questions of law, and disparate impact of those policies and practices. He also prepared a lengthy affidavit for the EEO investigator and assisted counsel extensively on multiple rounds of briefing. After years of work in the administrative process, the Agency denied class certification, and the EEOC denied his timely appeals in 2018.

Jones, too, began EEO counseling with the Bureau's Office of Civil Rights in 2014 to address her claims of discrimination and retaliation. Shortly thereafter, she engaged Plaintiffs' counsel to represent her and a putative class. Through counsel, she filed a putative class EEO administrative complaint with the CFPB's Office of Civil Rights alleging discrimination and retaliation on behalf of herself and all others similarly situated. Jones worked tirelessly throughout the administrative process, providing the Administrative Judge information to

2

support class certification and assisting counsel extensively on multiple rounds of briefing. However, as with Paz-Chow's complaint, the Agency denied class certification, and the EEOC denied her timely appeal in 2018.

Despite the EEOC's rulings, Paz-Chow and Jones remained committed to seeking justice for themselves and their Black/African American and Hispanic peers. They both deeply believed in the Bureau's mission, including its role in fighting discrimination. Thus, they made the courageous decision to bring a public lawsuit against their current (for Jones) or former (for Paz-Chow) employer. In September 2018, they filed this putative class action alleging, among other things, that the Bureau violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, by subjecting Black/African American and Hispanic Consumer Response Specialists to agency-wide discriminatory and retaliatory policies and practices, including paying them lower wages than non-minority employees because of their race and/or ethnicity and discriminating in other terms and conditions of their employment. (Dkt. 1.) In December 2018, Plaintiffs filed an Amended Complaint with leave of the Court, which Defendants answered, denying the allegations. (Dkts. 8, 9.)

After beginning discovery in 2019, the parties jointly requested a stay and referral to mediation, which the Court granted in May 2019. (Minute Order of May 10, 2019.) To prepare for the mediation, Plaintiffs sought and received from the Bureau employee data and other individual personnel records such as performance reviews, resumes, and position descriptions. Plaintiffs retained an expert to analyze the data in advance of the mediation. The mediation session was productive but not conclusive, and the parties determined that more work needed to be done. The mediation referral terminated in January 2020, and the Court lifted the stay. (Minute Order of January 27, 2020.)

Over the next year and a half, the parties engaged in substantial fact discovery. The parties tirelessly negotiated and fiercely litigated discovery disputes, including through two conferences with the Court in May and July 2020 and motion practice in July 2020. Negotiations regarding discovery continued after the Court ruled on the Bureau's Motion for Protective Order, as documented in the parties' weekly joint status reports submitted from July 31, 2020, through the second mediation stay on February 4, 2022. (Dkts. 46, 137.) As a result, both parties produced expansive discovery, including interrogatories, well over 100,000 documents, and extensive human resources and compensation data.

Plaintiffs' counsel took seven depositions, including several under Federal Rule of Civil Procedure 30(b)(6), regarding the Bureau's policies, practices, and procedures governing position classification, pay setting, and "career ladders," which permitted employees to progress within a position from one pay band to the next without a competitive process. These depositions also covered the Bureau's processes for tracking discrimination and retaliation complaints, as well as whether and how the Bureau studied any potential disparate impact caused by its compensation policies. In April 2021, Named Plaintiffs sat for their depositions (Jones' deposition occurred in two separate sessions).

The parties retained experts in labor economics and statistics to conduct statistical analyses of the workforce data, and the parties exchanged expert reports. Specifically, in his June 2021 report, Plaintiffs' expert analyzed compensation data of employees in certain positions and pay bands in the Office of Consumer Response from 2012 to 2020. This analysis included a linear regression to determine whether there were statistically significant racial disparities in compensation after controlling for other variables. Plaintiffs' expert also conducted a longitudinal compensation analysis, studying whether there were statistically significant

disparities in pay based on race among the same employees over time. After the Bureau produced a rebuttal expert report in September 2021, Plaintiffs' expert submitted his December 2021 reply responding to critiques.

Armed with facts gathered from extensive discovery and with expert analyses of the Bureau's workforce and compensation data, the parties again agreed to mediate. The parties engaged Martin F. Scheinman, Esq., a highly experienced professional mediator, skilled in mediation of complex class actions and employment discrimination litigation. Mr. Scheinman became familiar with the case and conducted two mediation sessions. After the first mediation session, the parties exchanged drafts of the Settlement but reached an impasse as to how to distribute the Settlement Fund. A second session with Mr. Scheinman resolved the impasse. In the months that followed, the parties continued to negotiate their principled positions on how best to distribute the Settlement Fund, as well as other terms of the Settlement.

The formal mediation sessions and follow-up discussions between the parties resulted in the Settlement. During the negotiations, counsel bargained vigorously on behalf of their clients. Due to the extensive discovery and expert reports, both sides were familiar with the strengths and weaknesses of their positions. All negotiations were conducted at arm's length and in good faith. Moreover, Named Plaintiffs did not merely attach their name to this lawsuit—they actively participated throughout the case and in every aspect of the settlement process. Understanding and fulfilling their fiduciary duties to the class, Named Plaintiffs attended mediation sessions; were fully informed of the facts, law, and their expert's data analyses and findings; and had lengthy information sharing and strategy meetings with Plaintiffs' counsel before and after mediation sessions.

## II.     Summary of the Settlement Terms

The proposed Settlement, attached as Exhibit 1, provides substantial monetary relief and valuable and meaningful Programmatic Relief for Class Members.

### A.     The Settlement Fund and Claims Resolution Process

The Settlement establishes a Settlement Fund of $6 million to compensate Settlement Class Members; provide for any court-approved attorneys' fees, costs, and service awards; and provide for all costs of administering the Settlement. (Settlement § VIII.A.)

The Settlement Fund will be distributed using an innovative Claims Resolution Process that provides for both formulaic compensation based on the length of time Settlement Class Members occupied certain pay bands while meeting the class definition (the "Time in Pay Band Award") as well as the opportunity for an individualized assessment of their claims by a Special Master and/or independent Neutral (the "Discretionary Award"). (*Id.* §§ VIII.C.) All Settlement Class Members will receive a Time in Pay Band Award. (*Id.* § VIII.C.2.) To receive a Discretionary Award, a Settlement Class Member must submit a Claim Form. (*Id.* § VIII.C.3.) The Special Master will oversee the Claims Resolution Process and approve the amount of all Monetary Awards, ensuring fairness and consistency. (*Id.* § VIII.C.4–5.) Plaintiffs' counsel will provide information to the Special Master regarding the relevant CFPB policies and practices and the factual and legal bases for the lawsuit. (*Id.* § VIII.C.4.a.) The Bureau will provide the Special Master with data needed to calculate the Time in Pay Band Award. (*Id.* § VIII.C.2.)

Plaintiffs' counsel will assist Settlement Class Members throughout the approval and Claims Resolution Process, answering questions, explaining the claims process, and assisting Settlement Class Members in completing their Claim Forms. (*Id.* § VIII.D.)

B.     **Programmatic Relief**

The Bureau has agreed to Programmatic Relief over a three-year period that is designed to ensure Class Members are aware of their rights regarding complaints about race discrimination and retaliation. (*Id.* § VII.)

Further, current Bureau employees holding positions that qualify them for membership in the class are part of a bargaining unit represented by the National Treasury Employees Union ("NTEU"). Named Plaintiffs helped to establish the NTEU at the Bureau. Jones served as a union steward and Paz-Chow served as a chief steward. Contemporaneous with the prosecution of this lawsuit, the Bureau and NTEU, including members of this class, have engaged in vigorous negotiations regarding compensation reform. These efforts were ultimately successful, and in December 2022, the Bureau and NTEU entered into a negotiated agreement that reformed the Bureau's pay system entitled: "Agreement on Compensation Reform Pay Reset" ("Pay Agreement"). Plaintiffs' counsel and Named Plaintiffs recognize that the Pay Agreement substantially addresses the issues that they would have sought to address through Programmatic Relief in this matter.

## ARGUMENT

**I.     The Class Should Be Provisionally Certified for Settlement Purposes**

Plaintiffs move to provisionally certify a class of Black/African American, and/or Hispanic employees of the Bureau who, at any time between February 13, 2011, and April 19, 2022, served in a non-supervisory position(s) that was assigned to the Bureau's Office of Consumer Response, that was in pay bands identified by the Bureau as 4, 4A, 4B, 40, 41, 5, 5A, 5B, 5C, 51, 52, 53, 6, 6A, or 60, and that was classified by the Bureau as falling within occupational job series code 301 (except that service in any of the following positions does not make an individual eligible to

7

be a member of the class: Consumer Response Implementation Manager (associated with position description number 110090), Consumer Response Manager (Quality Control) (associated with position description number 111410), Policy Analyst (associated with position description number 110210), or Consumer Response Analyst (associated with position description number 110770)).

Before assessing whether the Settlement is within the range of reasonableness for purposes of preliminary approval, the Court conducts an independent class-certification analysis. FED. R. CIV. P. 23(e)(1). The Court should certify the class as it meets all the requirements for certification under Federal Rule of Civil Procedure 23(a) and Rule 23(b)(2) and (b)(3).

### A.     The Class Meets All Requirements of Rule 23(a)

The proposed Class meets all requirements of Rule 23(a) as "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a).

Numerosity is met as the class includes 85 members, making joinder impracticable. *See, e.g.*, *Taylor v. D.C. Water & Sewer Auth.*, 241 F.R.D. 33, 37 (D.D.C. 2007) ("There is no specific threshold that must be surpassed in order to satisfy the numerosity requirement," however "courts in this jurisdiction have observed that a class of at least forty members is sufficiently large to meet this requirement.")

Through discovery, Plaintiffs identified common questions of law and fact that meet Rule 23(a)(2), including whether the Bureau engaged in a pattern or practice of racial discrimination and/or national origin discrimination and whether the Bureau's policies and practices regarding

8

compensation, pay setting, and movement within the Bureau discriminated against African American and Hispanic employees. *See Taylor*, 241 F.R.D. at 40, 48 (certifying class of Black employees in Title VII action in part due to discriminatory compensation policies and practices). The parties engaged in substantial discovery on these topics, including 30(b)(6) depositions about the Bureau's policies and practices for classifying positions, creating position descriptions, and assigning pay bands and career ladders.

Named Plaintiffs' claims are typical of the class claims because Named Plaintiffs, like the class, are Black/African American or Hispanic, meet the definition of class membership, and allege they were subjected to and harmed by the same discriminatory policies and practices at issue in this litigation. *See Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 156 & 157 n.13 (1982); *Cook v. Billington*, No. 82-cv-0400, 1988 WL 142376, at *4 (D.D.C. Dec. 13, 1988) (finding named plaintiffs met typicality requirement when they "allege that they and the proposed class have suffered from the same employment practice").

Named Plaintiffs, if appointed as class representatives, will continue to protect the interests of the class fairly and adequately. They have devoted considerable time to meeting with Plaintiffs' counsel and participating in the negotiation of this Settlement. Plaintiffs retained experienced counsel, who have regularly been appointed class counsel, including in other employment discrimination class action lawsuits. *See, e.g.*, *Bland v. Edward Jones*, No. 18-cv-3673 (N.D. Ill. May 4, 2021), ECF No. 124; *Senegal v. JPMorgan Chase Bank N.A.*, No. 18-cv-6006 (N.D. Ill. Sept. 12, 2018), ECF No. 18; *Creighton v. Metropolitan Life Insurance Co.*, No. 15-cv-08321, ECF No. 109; *Slaughter v. Wells Fargo Advisors, LLC*, No. 13-cv-6368 (N.D. Ill. Jan. 17, 2017), ECF No. 103; *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. 05-cv-6583, 2012 WL 5278555, at *1 (N.D. Ill. July 13, 2012); *Cremin v. Merrill Lynch, Pierce,*

*Fenner & Smith, Inc.*, 328 F. Supp. 2d 865 (N.D. Ill. 2004); *Martens, et al. v. Smith Barney*, No. 96-cv-3773 (S.D.N.Y.); *Biondo v. City of Chicago*, No. 88-cv-3773 (N.D. Ill.).

      **B.**      **The Class Meets the Requirements of Rule 23(b)(2) and 23(b)(3)**

Certification under Rule 23(b)(2) is warranted because Plaintiffs allege that Defendants "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2). Plaintiffs allege that every Class Member was subject to Bureau-wide policies and practices that harmed Black/African American and Hispanic non-supervisory employees within the Office of Consumer Response, including compensation policies.

The class is also properly certified under Rule 23(b)(3). The common factual and legal issues and proof of class-wide liability and damages this case presents are "questions of law or fact common to class members that predominate over any questions affecting individual members," and a class action is therefore "superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3); *see Moore v. Napolitano*, 926 F. Supp. 2d 8, 33 (D.D.C. 2013) (finding predominance and superiority in Title VII pattern and practice race discrimination case); *Chi. Tchrs. Union v. Bd. of Educ. of City of Chi.*, 797 F.3d 426, 443–45 (7th Cir. 2015) (Rule 23(b)(2) and 23(b)(3) certification in case for injunctive and monetary relief).

The parties' Settlement is relevant to the Rule 23(b)(3) analysis. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 619–20 (1997). Any manageability or predominance concerns relating to individual proceedings and defenses are satisfied by the Settlement and its Claims Resolution Process. *See In re APA Assessment Fee Litig.*, 311 F.R.D. 8, 18 (D.D.C. 2015) ("[T]he existence

of a settlement that eliminates manageability problems can alter the outcome of the predominance analysis." (internal quotations omitted)).

## II. The Settlement Should Be Preliminarily Approved

At the preliminary approval stage, courts review class action settlements to determine whether they are "within the range of possible approval." *Stephens v. Farmers Rest. Grp.*, 329 F.R.D. 476, 482 (D.D.C. 2019) ("Courts will generally grant preliminary approval of a class action settlement if it appears to fall within the range of possible approval and does not disclose grounds to doubt its fairness or other obvious deficiencies." (internal quotes omitted)). Courts in this circuit operate under "'the principle of preference favoring and encouraging settlements in appropriate cases,' given the 'long-standing judicial attitude favoring class action settlements.'" *Howard v. Liquidity Servs. Inc.*, No. CV 14-1183, 2018 WL 4853898, at *3 (D.D.C. Oct. 5, 2018) (quoting *In re Vitamins Antitrust Litig.,* 305 F. Supp. 2d 100, 103 (D.D.C. 2004)). This Settlement provides outstanding monetary and programmatic relief to Class Members and is well within the range of possible approval.

### A. The Settlement Provides Substantial and Meaningful Relief to the Class

The Settlement Fund of $6 million provides exceptional monetary relief to the Settlement Class Members harmed by the policies and practices challenged in this litigation. If approved, the Settlement Fund will rank among the larger employment discrimination settlements of the past several years.[2] None of the Settlement Fund will revert to the Bureau unless the remainder

---

[2] *See, e.g.*, SEYFARTH, *18th Annual Workplace Class Action Litigation Report* at 33–34, https://www.content.seyfarth.com/publications/Workplace-Class-Action-Report-2022/33/; SEYFARTH, *17th Annual Workplace Class Action Litigation Report* at 33–34, https://www.seyfarth.com/dir_docs/publications/WCAR_SAMPLE_2021.pdf; SEYFARTH, *16th Annual Workplace Class Action Litigation Report* at 33–34, http://seyfarth-ebooks.com/Workplace-Class-Action-Litigation-Report-2020/; SEYFARTH, *15th Annual Workplace Class Action Litigation Report* at 33–34, https://workplaceclassaction.lexblogplatform.com/wp-content/uploads/sites/214/2019/01/2019-CAR-Chapters-1-and-2-Final.pdf.

in the Settlement Fund is so little it is not financially feasible to distribute it. (Settlement § VIII.E.4.)

The Settlement creates an individualized process for fair allocation of the Settlement Fund. The Claims Resolution Process provides Settlement Class Members a meaningful opportunity to have their claims individually assessed. Unlike many other settlements, Monetary Awards for Settlement Class Members will not be computed solely by formula. Instead, Settlement Class Members may elect to file a Claim Form and participate in a nuanced and detailed process through which they may receive an individualized assessment of their claims, including consideration of alleged post-employment wage loss and any emotional distress. (Settlement § VIII.C.3–5.) The parties cooperatively worked to design this program, which redresses alleged wage disparities during CFPB employment while maintaining the flexibility to compensate for damages resulting from other forms of alleged discrimination, such as retaliation, hostile work environment, or wrongful discharge. In this way, Settlement Class Members' Monetary Awards will be directly tied to the damages they would allege from the claims they are releasing. The total Monetary Award for any one Settlement Class Member is capped at $300,000 to ensure that no Settlement Class Member is paid a disproportionate amount of the Settlement Fund. (Settlement § VIII.C.5.b.)

Subject to approval of the Court, the Claims Resolution Process will be monitored by an experienced, well-qualified Special Master, Professor Lynn P. Cohn, Director of the Center on Negotiation and Mediation at the Northwestern Pritzker School of Law, who has been appointed in a similar capacity by other courts. *See, e.g.*, *Creighton v. Metropolitan Life Insurance*, 15-cv-08321 (S.D.N.Y. 2017), ECF No. 108; *Slaughter v. Wells Fargo Advisors, LLC*, 13-cv-6368, (N.D. Il. 2017), ECF No. 109, *McReynolds v. Merrill Lynch*, 05-cv-6583 (N.D. Ill. 2014), ECF

Nos. 585-1, 637. Professor Cohn will review and assess the Claim Forms and make final awards, providing fairness and consistency. To ensure the best-informed decisions, Plaintiffs' counsel will provide training for Professor Cohn and any independent, qualified Neutrals who assist her regarding the Bureau's employment practices and the class claims.

Plaintiffs' counsel will also assist and provide support for Settlement Class Members throughout the Claims Resolution Process by answering questions, advising them of their rights and options, and helping them complete and submit Claim Forms.

### B. The Settlement Is an Outstanding Result for the Class in Light of the Risks of Proceeding Through Trial and Appeal

Absent this Settlement, continued litigation of this action would be complex and lengthy, requiring the investment of considerable resources by both sides. The appropriateness of class certification and liability in this case is hotly contested, and both sides would face considerable risks should the litigation proceed. If this class were certified outside of the settlement process, Plaintiffs' counsel expects the Bureau would file a Rule 23(f) appeal and, if necessary, a petition to the Supreme Court. Even if Plaintiffs overcame these risks—even if they obtained class certification, defeated the Bureau's merits defenses, and obtained a favorable liability verdict on behalf of the class at trial—they still would not have been guaranteed a class-based recovery, as the Court might determine that separate individual damages trials were necessary, introducing additional risk and delay for each Class Member who sought a recovery. Thus, absent a settlement, the class would face a class certification fight, a potential Rule 23(f) appeal, *Daubert* motions, a motion for summary judgment, and more years of litigation before any Class Member could potentially recover on his or her claim.

Further, many of the Class Members are current employees. If this case were to go to trial, these Class Members could be called upon to testify against their current employer, creating further risk and downsides to continued litigation.

In light of the potential outcomes and risks, this Settlement is an outstanding result that will provide significant monetary relief available to each and every Class Member, even though some may not have prevailed in their individual claims in court.[3] In contrast to the complexity, delay, risk, and expense of continuing litigation, the proposed Settlement will produce prompt, certain, and substantial recovery for Settlement Class Members. Considering the complicated, uncertain, and lengthy litigation facing Class Members, the Settlement is plainly in the best interests of the class.

### C.  The Settlement Is Supported by Competent, Experienced Counsel and Is the Product of Arm's Length, Informed Negotiations

Based on its experience and an in-depth analysis of the merits, record, and risks of this action, Plaintiffs' counsel enthusiastically recommends this Settlement to the Court for approval. The terms of the Settlement were reached after a fulsome exchange of discovery and extensive negotiations with the assistance of an experienced mediator. The settlement negotiations were protracted and difficult and occurred during multiple mediation sessions and over a year's worth of subsequent discussions. Named Plaintiffs attended and participated fully in mediation sessions, along with their counsel. The Settlement is the non-collusive product of litigation and mediation. These factors weigh heavily in favor of approving the Settlement. *See In re Vitamins*

---

[3] *See, e.g.*, Hon. Denny Chin, *Summary Judgment in Employment Discrimination Case: A Judge's Perspective*, 57 N.Y.L SCH. L. REV. 671, 672–73 (2013) (summary judgment is granted, in whole or in part, in employment discrimination cases approximately 77% percent of the time, a higher rate than other types of civil cases); *accord* Memorandum from Joe Cecil & George Cort, Fed. Judicial Ctr., to Judge Baylson, at 3 (Aug. 13, 2008), available at https://www.uscourts.gov/sites/default/files/sujulrs2.pdf (in employment discrimination cases in federal court, summary judgment motions by defendants are more common, more likely to be granted, and more likely to terminate the litigation than other case types).

14

*Antitrust Litig.*, 305 F. Supp. 2d 100, 104 (D.D.C. 2004) ("A presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's length negotiations between experienced, capable counsel after meaningful discovery." (internal quotation marks omitted)).

### D. The Proposed Service Awards and Attorneys' Fees Are Reasonable[4]

Plaintiffs' counsel is proud to have advocated for the class alongside Named Plaintiffs and will petition the Court to award Service Awards to compensate Named Plaintiffs for their considerable efforts on behalf of the class.[5] *See Little v. Washington Metro. Area Transit Auth.*, 313 F. Supp. 3d 27, 39 (D.D.C. 2018) ("Courts routinely compensate named plaintiffs for the services provided and the risks incurred during class action litigation."). The $50,000 service awards are comparable to awards granted by courts in similar cases to class representatives who made substantial investments of time and effort and achieved outstanding results for the classes of employees they represented. *See, e.g.*, *McReynolds v. Merrill Lynch*, No. 05-cv-6583 (N.D. Ill. Dec. 6, 2013), ECF No. 616 at 5 (17 class representatives awarded service awards of $250,000 each, constituting 2.6% of fund); *Senegal v. JPMorgan Chase Bank N.A.*, No. 18-cv-6006 (N.D. Ill. Dec. 20, 2018), ECF No. 40 at 5 (6 class representatives each awarded $150,000, constituting 2.7% of fund); *Slaughter v. Wells Fargo*, No. 13-cv-6368, 2017 WL 3128802, at *3 (N.D. Ill. May 4, 2017) ($175,000 each to 6 class representatives, constituting 3% of fund); *Thomas v. Albright*, 139 F.3d 227, 229 (D.C. Cir. 1998) (approving $125,000 worth of incentive awards from a $3.8 million fund in a Title VII race discrimination case); *Ingram v. Coca-Cola Co.*, 200

---

[4] The parties support the settlement unconditionally regardless of whether the Court approves or disapproves any requests for Attorneys' Fees and Costs and for Service Awards for Named Plaintiffs. Defendants reserve the right to submit their position on Plaintiffs' petition for Attorneys' Fees and Costs and for Service Awards for Named Plaintiffs after the Plaintiffs' file their formal request for Attorneys' Fees and Costs and Service Awards for Named Plaintiffs. The Court's ruling on any petitions for Attorneys' Fees and Costs or Service Awards for Named Plaintiffs is appropriately not tied to the parties' unconditional support of the Settlement Agreement.
[5] Exhibit 3 includes a proposed briefing schedule for a petition for Attorneys' Fees and Costs and for Service Awards for Named Plaintiffs, tied to any Court-set date for a Fairness Hearing.

F.R.D. 685, 694 (N.D. Ga. 2001) (approving $300,000 incentive awards in race discrimination case); *see also Wells v. Allstate Ins. Co.,* 557 F. Supp. 2d 1, 8–9 (D.D.C. 2008) (permitting $10,000 service awards from fund that generated a $666 per capita recovery); *Little*, 313 F. Supp. 3d at 35, 39 (permitting $7500 service awards from fund that generated a roughly $1500 per capita recovery).

      Here, Named Plaintiffs did much more than lend their name to a lawsuit. Each initiated EEO counseling with the Bureau's Office of Civil Rights before retaining counsel, and this case has been a part of their lives for almost the past decade. After the EEOC denied their appeals, they made a courageous and risky choice to publicly sue their current (in Jones's case) and former (in Paz-Chow's case) employer. Named Plaintiffs have been an invaluable resource for Plaintiffs' counsel, aiding counsel's investigation, helping prepare EEO complaints and court pleadings, sitting for depositions, and participating in multiple mediation sessions. Their risk and hard work paid off: they achieved a Settlement Fund of $6 million, an exceptional result for the class. Their active role throughout the case—from pre-suit investigation and EEO litigation through multiple mediation sessions—was essential to achieving the significant relief for their fellow Class Members. Named Plaintiffs were also involved with and aware of the actions of NTEU, having helped to establish the NTEU at the Bureau. The NTEU's negotiations with the Bureau resulted in the new Pay Agreement late last year. Plaintiffs' counsel will file a separate motion in support of Named Plaintiffs' Service Awards.

      The Settlement also provides for Plaintiffs' counsel to petition the Court for reasonable attorneys' fees in an amount no greater than 25% of the Settlement Fund. This fee is considerably lower than the 33⅓% contingency rate fee agreements negotiated and executed by Named Plaintiffs and below the lodestar. The D.C. Circuit has held that "a percentage-of-the-

16

fund method is the appropriate mechanism for determining the attorney fees award in common fund cases." *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1271 (D.C. Cir. 1993). Courts in this Circuit "have often considered the following seven factors," in determining whether to award attorneys' fees: "(1) 'the size of the fund created and the number of persons benefited'; (2) 'the presence or absence of substantial objections by class members to the settlement terms or fees requested by counsel'; (3) 'the skill and efficiency of the attorneys involved'; (4) 'the complexity and duration of litigation'; (5) 'the risk of nonpayment'; (6) 'the time devoted to the case by plaintiffs' counsel'; and (7) 'awards in similar cases." *Howard*, 2018 WL 4853898, at *7 (quoting *In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*, 4 F. Supp. 3d 94, 110 (D.D.C. 2013)). A fee of 25% of the Settlement Fund is reasonable and well within the range of attorneys' fee awards in cases involving comparable risks and litigation costs. *See Little,* 313 F. Supp. 3d at 38 (approving 25% of common fund for attorneys' fees and costs in Title VII case); *Trombley v. Nat'l City Bank*, 826 F. Supp. 2d 179, 205–06 (D.D.C. 2011), ("It has been observed that fee awards nationally appear to fall in a range of 20% to 30% of the common fund, and that the fees in this Circuit mirror those nationwide numbers."); Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL L. STUD. 811, 833–35 (2010) (finding that class counsel in labor and employment cases nationwide were awarded on average 28% of the common fund). Plaintiffs' counsel also seek reimbursement of costs which are estimated at $150,000 at this time. Plaintiffs' counsel will file a separate petition for Attorneys' Fees and Costs.

**III.   The Proposed Class Notice Is Appropriate**

The proposed Notice (Exhibit C to Exhibit 1) will provide clear and adequate notice so that each Class Member can make an informed choice about whether to opt out, object, and/or

seek a Monetary Award. FED R. CIV. P. 23(e). It is clear, accurate, and satisfies due process. The Notice provides a summary of the terms of the Settlement, including the proposed Claims Resolution Process for Monetary Awards and the procedures for opting out, objecting, and submitting a Claim Form, and it provides sufficient time to give Class Members a fair opportunity to respond. If the Court grants preliminary approval, within 10 days after receiving Class Member information from the Bureau, the Claims Administrator will send via mail Notice of the Settlement to Class Members identified in the Bureau's workforce data as meeting the class definition during the class period. Class Members can respond to the Notice by filing objections with the Court or sending opt-out notices to the Claims Administrator. Pursuant to the Settlement, the Claims Administrator costs, including those "related to sending all notices," are payable from the Settlement Fund. (Settlement § VIII.A.)

## CONCLUSION

For all the foregoing reasons, the parties respectfully request that the Court enter the Order attached as Exhibit 2: (1) provisionally certifying a class for settlement purposes; (2) preliminarily approving the proposed Settlement; (3) provisionally appointing Plaintiffs' counsel as Class Counsel and the Named Plaintiffs as Class Representatives for settlement purposes; (4) approving and directing distribution to Class Members the Notice; and (5) setting a schedule for the final approval process.

Dated: August, 31, 2023

                                             Respectfully submitted,
                                             **STOWELL & FRIEDMAN, LTD.**

                                             By: */s/ Linda D. Friedman*
                                                         Linda D. Friedman

Linda D. Friedman
(Admitted Pro Hac Vice)
George S. Robot (IL0047)
Truscenialyn Brooks
(Admitted Pro Hac Vice)
Caitlin M. Kearney
(Admitted Pro Hac Vice)
Stowell & Friedman
303 W. Madison St., Ste. 2600
Chicago, IL 60606
Telephone: (312) 431-0888
lfriedman@sfltd.com
grobot@slftd.com

Justin Leinenweber
(Admitted Pro Hac Vice)
Justin L. Leinenweber, P.C.
120 N LaSalle St Ste 2000,
Chicago, IL 60618
Phone 312-857-3405
justin@ilesq.com